RICHARD B. ZANE AND BARBARA ZANE, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent; PHILLIP L. LIBERTY AND JUDITH K. LIBERTY, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Zane v. Commissioner
Docket Nos. 3849-83, 6637-83.
United States Tax Court
T.C. Memo 1988-392; 1988 Tax Ct. Memo LEXIS 423; 55 T.C.M. (CCH) 1665; T.C.M. (RIA) 88392; August 22, 1988. Sanford Amdur, for the petitioners. Susan G. Lewis and Patricia H. Delzotti, for the respondent. PARKER
MEMORANDUM FINDINGS OF FACT AND OPINION PARKER, Judge: In these consolidated cases, respondent determined deficiencies in petitioners' Federal income tax for the calendar year 1980 as follows: Docket No.
Taxpayers
Deficiency
3849-83
Richard B. and Barbara Zane
$ 8,109
6637-83
Phillip L. and Judith K. Liberty
$ 8,742
After concessions, [1] the issues for decision are: (1) Whether petitioners entered into their Geostar distributorships with an actual and honest *428 profit objective pursuant to section 183; [2]
(2) Whether and, if so, to what extent petitioners should be denied deductions under section 1253 because their "partial recourse promissory notes," given for the purchase of the Geostar distributorships, were too contingent and speculative to be considered part of the "principal sum" for Federal tax purposes; and (3) Whether and, if so, to what extent petitioners were "at risk" within the meaning of section 465 with respect to investments in their Geostar distributorships. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulations of facts and exhibits attached thereto are incorporated herein by this reference. Petitioners Richard B. Zane and Barbara Zane, husband and wife, resided in Wyckoff, New *429 Jersey on the date they filed their petition in this case. Petitioners Phillip L. Liberty and Judith K. Liberty, husband and wife, resided in Glen Rock, New Jersey on the date they filed their petition in this case. Petitioners Richard B. Zane and Phillip L. Liberty each filed a joint Federal income tax return (Form 1040) with his spouse for the calendar year 1980. All further references to "petitioners" are to Richard B. Zane and/or Phillip L. Liberty. Petitioner Richard B. Zane (Zane) is a graduate of the Wharton School of Finance, University of Pennsylvania, having majored in marketing. From the time of his graduation in 1965 through April of 1984, Zane was employed by International Business Machines Corporation (IBM) in various capacities including sales and marketing. When he left IBM, he was a director of sales, with national responsibility for selling office furniture and peripheral products for the IBM personal computer. While with IBM, Zane acted as a sales representative for IBM. He analyzed marketing studies of IBM and of companies other than IBM. As an employee of IBM, Zane was subject to certain restrictions on outside employment. He was precluded from selling *430 or marketing any product or service that directly competed with the IBM product line. Moreover, he was prohibited from engaging in activities that would affect his productivity or the time required to do his job with IBM. During the year 1980, Zane, while still employed by IBM, was looking for outside business ventures that would not conflict with his duties for IBM. Zane normally worked from seven in the morning until eight at night and on weekends. Zane is a sports enthusiast; he skis, he jogs, and for more than 30 years he has played tennis. Additionally, for seven or eight years prior to the trial of this case, he had been a racquetball player. Petitioner Phillip L. Liberty (Liberty) has both his bachelors degree and a masters degree in business administration from St. Edwards University in Austin, Texas. Liberty was also an employee of IBM. He held positions in sales administration and marketing, and at the time of trial was director of peripherals and supplies product marketing. At one point in his career with IBM, he was transferred to Atlanta, Georgia, where he was involved in finance and planning as a product forecaster, or product planner. As a product forecaster, *431 Liberty evaluated new products that were brought forth in the manufacturing and development divisions of IBM. Liberty is acquainted with Zane. Like Zane, Liberty is prevented by IBM company policy from engaging in any activities that would be competitive with IBM's business or that would take time that should be devoted to that company's activities. Liberty has even less free time than Zane. Liberty is by his own terms an "active athlete;" like Zane he plays tennis and racquetball. Both Zane and Liberty relied for tax and financial advice upon one Arthur Merrill Nicholson (Nicholson), a certified public accountant. Associated with Nicholson was a Richard Eldredge (Eldredge), who had previously been employed at IBM as a sales manager. Eldredge was a business and personal associate of both petitioners. Nicholson had been a certified public accountant since 1954. He maintained his own accounting practice and also operated AMN, Inc., a real estate brokerage firm. Prior to 1978, Nicholson had been retained by several clients to investigate investment opportunities. In particular, some clients (other than petitioners herein) had asked him to find a racquetball club opportunity. *432 Accordingly, Nicholson became familiar with the racquetball industry. He looked at the availability of various courts and trends in the growth of the racquetball sport. He became convinced that the racquetball industry was a growing market. Before 1980 Geostar Sports Products was a "doing business as" name for Diamond Corporation, an entity of which a Mr. Elliot Rovinsky (Rovinsky) was the principal officer and owner. Geostar Sports Products, Inc. was later incorporated to serve as a manufacturer and seller of racquetball racquets and tennis racquets. On November 4, 1978, Rovinsky had obtained an assignment of an "Application for a United States Trademark # 129,442" for "Geostar" from David Coleman (Coleman). On the same date, Rovinsky had also obtained from Coleman an assignment of an "Application for United States Letters Patent No. 755,539." The patent application covered a stringing pattern for racquets. On November 16, 1978, Rovinsky granted to one Howard Gatliff (Gatliff) the exclusive right to utilize the Geostar trademark and pending patent in Gatliff's efforts to sell Geostar tennis and racquetball racquet franchise territories, or "distributorships." In exchange, *433 Rovinsky was to get a minimum annual royalty payable at a rate of $ 20,000 per territory. The agreement also called for a splitting between Rovinsky and Gatliff of certain expenses and certain proceeds as were earned. The record does not disclose whether any earnings were generated pursuant to this agreement. The contract was terminated by its terms when Gatliff did not make a specified minimum number of sales. Rovinsky and Coleman then entered into another agreement on June 21, 1979, clarifying their earlier agreement. The stated purpose of this second agreement was to resolve "various disputes" that had arisen between the parties to the first agreement. This second agreement made reference to the trademark registration concerning the word "Geostar," as well as an assignment of the pending U.S. Patent Application, that is No. 755,539, "concerning a tennis racquet developed under the name 'Geostar.'" Pursuant to this agreement Rovinsky paid $ 10,000 to the assignors of the patent and trademark application for all their rights, title, and interest in the application. Geostar Sports Products, Inc. (hereinafter "Geostar") was incorporated by Rovinsky and J. C. Whitted on August 31, 1979. *434 Each incorporator owned one-half of the company's stock. Within a year, Rovinsky became the sole shareholder of Geostar. Rovinsky served as president and chairman of the board of Geostar. Although ostensibly a "manufacturer" of tennis racquets and racquetball racquets, Geostar never manufactured any such products itself. Geostar instead contracted the manufacture of its product line to other entities. Articles of Incorporation for Olympic Sports Products, Inc. (hereinafter "Olympic") were filed on November 9, 1979. The incorporators were Frank Joy and J. C. Whitted. Frank Joy was the sole shareholder of the corporation, although the record indicates he purchased only ten shares at $ 1.00 per share. Olympic was organized to sell Geostar racquet distributorships. Three days later, on November 12, 1979, Rovinsky entered into a master license agreement with Olympic whereby he granted Olympic a restricted master license to use the patent and trademark rights in connection with racquetball racquets. Olympic's function under the agreement was to sell distributorships to purchasers who would then have the right to market, sell, and distribute in their respective territories racquetball *435 racquets covered by the patent and trademark rights. The agreement said nothing about the distribution or sale of tennis racquets. The master license agreement specifically provided "Rovinsky hereby conveys to Olympic an exclusive license to utilize the Patent and Trademark Rights in the United States in connection with racquetball racquets." Furthermore, the agreement provided that the license conveyed to Olympic "is a restricted license in that it does not extend to any product or item other than racquetball racquets." Notwithstanding the agreement between Rovinsky and Olympic, Rovinsky, on June 30, 1980, entered into an agreement with one Frank Cardell (Cardell) for the sale of Geostar distributorships. The agreement recited that Rovinsky was the holder of certain patent and trademark rights pertaining to a stringing system for tennis and racquetball racquets. It further recited that the racquets had been developed and marketed under the name Geostar by Geostar Sports Products, Inc. The agreement then stated that Rovinsky relied upon Cardell's representation that Cardell had "substantial expertise in selling tax sheltered investments and is capable of selling by the close of *436 the calendar year all available Geostar distributorships." Cardell was to receive a commission of at least 35 percent of all the cash generated by the sales of such distributorships. The contract was effective for a period of 90 days, renewable at Cardell's option for another 90 days if he met a certain sales figure. When Cardell failed to make sufficient sales, Rovinsky terminated the contract as of September 30, 1980. Olympic had a directors' meeting on November 24, 1980. At that time Rovinsky and Lewis Stanton, Jr., were authorized to take all action necessary to consummate Exclusive License Agreements "pertaining to Geostar tennis and racquetball racquets" on behalf of the corporation. Olympic was set up "to engage in the sale and marketing of racquetball racquets." The record does not disclose if its Articles of Incorporation were ever changed. The record also does not disclose whether and, if so, how it ever acquired the right to sell tennis racquet distributorships. Olympic sold both Geostar tennis and racquetball racquet distributorships in 1980 and 1981. Olympic marketed the distributorships through lawyers, CPA's, and securities firms. Olympic sold no distributorships *437 in 1982, and the record does not disclose what happened to that corporation in 1982 and thereafter. Olympic, Geostar, and Diamond Corporation, Ltd. were all located at 6900 East Camelback Road, Suite 750, Scottsdale, Arizona. In 1980, Olympic paid the following amounts to Rovinsky and/or his corporations: Rovinsky, $ 108,123.65; Geostar, $ 60,941,20; Diamond Corporation, Ltd., $ 37,497.87. At least part of this money from Olympic was consideration for the grant of the master license agreement by Rovinsky in 1979 per the agreement between them. During 1980, Geostar employed a total of four or five people including Rovinsky and his father, Al Rovinsky. Olympic and Geostar shared the same bookkeeper, Al Rovinsky. During the year 1980, the Geostar program came to the attention of Nicholson, petitioners' tax and financial advisor. During the course of his investigation he was shown a brochure that described the stringing features of the Geostar racquet. Nicholson described the tri-radial stringing as a "unique design, almost like the Star of David." Nicholson then went to Arizona to visit Rovinsky in the fall of 1980. He determined that Rovinsky had a direct marketing operation *438 with a small inventory, but an operation which, to Nicholson, seemed to be comparable to other successful ventures. During the visit, Rovinsky made many representations about future marketing plans for the Geostar racquet. Rovinsky explicitly stated that he was trying to set up a series of national sales representatives and that he would be hiring noted racquetball professionals to be utilized by Geostar as part of an advertising campaign. Rovinsky also advised Nicholson of an advertising program to put advertising in specialty publications such as racquetball magazines. Nicholson made an "independent investigation" of Rovinsky's reputation only to the extent of asking an Arizona attorney, whom he (Nicholson) had not previously known, about Rovinsky. At the time of trial Nicholson could not remember the name of the attorney, but nevertheless professed that he trusted the opinion of that attorney. Nicholson also had been informed that Rovinsky was a successful Wall Street broker and a diamond merchant. Rovinsky told Nicholson that he (Rovinsky) had not been in the sports products field very long. Nicholson did not investigate this matter any further. Moreover, although Rovinsky *439 had advised Nicholson that sales representatives would be available to assist in the marketing of the product, Nicholson did not think that there were any sales representatives in the territories that petitioners later purchased. During the visit, Rovinsky provided Nicholson with a prospectus about the Geostar racquetball program. This was a 72-page document which contained materials for application for distributorships, an application to use the license that Rovinsky had provided to Olympic, and a 39-page tax opinion by the law firm of Himelrick, Gildar & Hilpert. The prospectus also contained another accountant's projection of tax benefits from investing in the Geostar program. The projections assumed that no sales would be made and that the allowable tax deductions would be $ 20,000 in the first year and $ 7,500 in the second year, or deductions in the ratio of cash spend of 4:1 in the first year and 3:1 in the second year. Nicholson accepted these calculations, which had been based on figures supplied by Olympic, without further verifying the underlying data. The prospectus also contained a marketing survey that was generally enthusiastic about the prospects for rapid growth *440 of racquetball as a national pastime, uncritically accepting the notion that there would be a total of 14 million racquetball players in the year 1980. The survey assumed that each Geostar distributorship would consist of a territory in the United States containing a population of approximately 325,000. The survey further assumed that ten percent of the frequent players, called the "heavy" players, would buy a Geostar racquet, and that one percent of the "light" or "medium" players would buy a Geostar racquet. Based upon these assumptions the survey predicted annual profits to the distributor of $ 7,846 when racquets were sold through intermediaries, such as retail outlets. If sales were made directly to consumers by the holder of a Geostar distributorship, the survey estimated that profits would be $ 29,062 per year. [3]
*441 The marketing survey also assumed that the Geostar racquet would move into a commanding position among the other leading racquets. The survey did not take into account the fact that other racquets had established name recognition and benefited from mass media advertising and a wider selection of models. Nor was there any indication in the survey that the racquets had ever been test marketed before being sold to the public -- a practice often followed by major racquet manufacturers. J. C. Whitted, who wrote the marketing survey, had been one of the incorporators of Olympic and of Geostar. Nicholson, however, was unaware that J. C. Whitted was associated with those entities. Nicholson and Eldredge then prepared their own more concise analysis of an investment in the Geostar program. Eldredge sent one version of this analysis to his former associates at IBM with a cover letter on Nicholson's stationery which stated, "Enclosed is a brief resume of our 1980 tax shelter for your review." Among the clients of Nicholson and Eldredge receiving this information were petitioners Zane and Liberty. The Nicholson/Eldredge analysis at first stressed the advantage of the Geostar racquetball *442 racquet with its "tri-radial stringing geometry." The materials indicated that the racquet offered a unique stringing system which distributed tension more equally, thus producing less vibration to the racquet and less player fatigue. The racquet also purportedly produced up to "60% more friction between ball and strings allowing the player to use more spin." The Nicholson/Eldredge materials described the average territory as consisting of "approximately 325,000 people, which should generate sales of over 1,300 racquets per year." The materials then set forth the following tables: TAX ADVANTAGES
Ratio
Tax
Cash to
Cash Tax
Cash
Cash
%
Investment
Write-off
Write-off
Savings
Cost
Profit
Return
$   5,000
$ 20,000
4 to 1
$ 10,000
$ 5,000
$ 5,000
100.00
2,500
7,500
3 to 1
3,750
2,500
1,250
50.00
20,000
-0-
-0-   -0- -0- -0- -0- 172,500
-0-
-0-   -0- -0- -0- -0- $ 200,000
$ 27,500
3.67 to 1
$ 13,750
$ 7,500
$ 6,250
83.33
SALES DATA PROJECTION
Sale 1,300 racquets at $ 45.00
$ 58,500
Payment on Note with interest at $ 6.75
$  8,775
Racquet cost at $ 15
19,500
Commission on sales at $ 4.50
5,850
34,125
Profit to owner
$ 24,375
*443 GEOSTAR
PROJECTED PAYOFF OF $ 20,000 NOTE
1st
2nd
3rd
Total
Principal
$ 7,575
$ 8,030
$ 4,395
$ 20,000
Interest
1,200
745
264
2,209
$ 8,775
$ 8,775
$ 4,659
$ 22,209
The materials advised that a distribution licensee could do his own marketing or "hire a manufacturers representative to market racquet at a cost of approximately 10% of the wholesale cost." The tax advantages table and the sale data projection tables appear to be very similar to, but not exact copies of, materials provided in the Geostar prospectus. Zane was familiar with tennis and racquetball racquets. He was a tennis player and an occasional racquetball player himself. Zane examined the Geostar 357 racquetball racquet which Nicholson had furnished to him and noted that the tri-radial stringing design and the size were different, and that at least to him they appeared to be unique. The Geostar racquetball racquet was actually the standard size frame, and only the so-called "sweet spot" was larger. Zane had seen an oversized racquet called the "Prince" racquet before and he supposed because of the tri-radial design that the Geostar racquet had a larger "sweet *444 spot," and hence the racquet provided the average player with a better chance to score points. Zane's introduction to the Geostar racquet came in a conversation with Eldredge that took place in October of 1980. By then it appeared to Zane that racquetball was a growing sport, in part because it seemed that tennis players were looking for a winter pastime. Zane himself noticed that more racquetball courts were being constructed and that there had been substantial growth in the industry. Zane accordingly viewed the Geostar distributorship as a chance to earn extra income with the expenditure of minimal time. Zane's conclusions were buttressed by the Geostar prospectus, which he reviewed but did not examine in detail. Zane was particularly impressed with the "outside" study prepared by Whitted, which projected a great future for the sport of racquetball. He was unaware of Whitted's association with Olympic and Geostar. Zane was also impressed with the notion that he would have the exclusive rights for sales in a territory to be selected by him. Zane, however, was not satisfied with the figures presented to him. He accordingly prepared his own arithmetic analysis of the Geostar *445 program. Zane's analysis indicated that even sales at one-third the projections would have indicated that his investment would be paid off in eight and one-half years, leaving a profit of approximately $ 6,000. Zane took into consideration the tax advantages of investing in a Geostar program in reaching his decision. However, tax savings were not his primary reason for investing; primarily, he wanted to make money. When he invested Zane thought that there would be follow-on activities in the Geostar program, including the issuance of racquetball-related products by Geostar, a program of national advertising conducted by Geostar, and the acquisition of endorsements by noted racquetball professionals for the Geostar racquets. With respect to his own efforts, Zane planned to engage in direct mail campaigns and to contact retail outlets in his territory. He was interested in supplying sample racquets to college students who would sell the racquets to other students on a commission basis. Zane's wife Barbara was prepared to devote as much time as was necessary to the distributorship. In evaluating the Geostar program, Zane relied heavily on Nicholson. Zane had faith in Nicholson's *446 advice. Nicholson explained to Zane that the Geostar program was a good opportunity for earning extra income; Zane knew that Nicholson himself had been to Arizona to investigate the program. Zane did very little investigation on his own. He did not verify the population of the territory that he had been assigned nor did he see any experts regarding the quality of the racquet that he was to sell. At the time of trial Zane was unaware of when Olympic or Geostar began its operation in business or what the involvement of either with racquetball had been nor did he know whether a patent had been obtained for the tri-radial stringing pattern. Petitioner Liberty followed a similar course. Liberty, however, made his own sales projections based upon materials supplied by Nicholson and Eldredge. He determined that the projections made in those materials -- which assumed a sale of 1,300 racquets per year at a price of $ 45 -- were too aggressive. According to Liberty's arithmetic analysis, however, he could sell 1,300 racquets at $ 30, or 350 racquets at $ 45 and still make money, that is, he could still pay off the $ 20,000 obligation that he had, in his own mind, bound himself to pay. *447 Like Zane, Liberty was also a tennis and racquetball player. He had been familiar with other types of racquets, and he thought that the Geostar racquet would make money for him in the long run. Although tax savings played a factor in his decision to invest, they were only one factor in his decision. His determination to invest was based in part upon representations that the Geostar racquet would be advertised nationally, that Geostar would employ a system of manufacturer's representatives to do the sales, and that there would be cooperative advertising. He did not recall hearing about Geostar's plan to hire a "name" professional until after he had invested. [4]
*448 Like Zane, Liberty did not perform any independent investigation of the background of Olympic or Geostar, of the construction and quality of the Geostar racquet, or of the status of the patent which presumably was being utilized in construction of the tri-radial stringing method. Instead, like Zane, Liberty relied on the advice of Nicholson, who had undertaken a rather limited investigation of the Geostar program. Late in 1980, each petitioner submitted his application for a separate 12-year license to sell, in a designated territory, Geostar racquetball racquets utilizing the patent-pending Geostar stringing system. The cost of each distributorship was $ 200,000. Neither petitioner attempted to bargain over the price. Each petitioner paid $ 5,000 down when he submitted his application. Each agreed that by the first of March 1981 he would pay an additional $ 2,500 pursuant to a short-term "recourse" note each executed at the time of the application. [5] The balance of the $ 200,000 purchase price, some $ 192,500, was payable by a non-negotiable note at six percent simple interest, which each petitioner tendered with the application. That note called a "partial recourse promissory *449 note" and the accrued interest thereon were originally due in 1990. No interest payment was due until the entire principal of the note was paid in full. The note provided that the maker would be "personally" liable only for $ 20,000. The $ 172,500 principal balance, plus interest, was payable only from 15 percent of the gross receipts upon the sale of the racquets or from foreclosure on the distributorship in the event of nonpayment. The terms of each petitioner's application further provided as follows: WARRANTY STATEMENT AND APPLICATION FOR LICENSE * * * The applicant by executing this Warranty Statement does hereby certify that: 1. He has *450 received the marketing study of J. C. Whitted & Associates, Inc. (the "Survey"), the Brochure describing the Product and the organization of Olympic's marketing network, and the Exclusive License Agreement (the "Agreement"), which sets forth the obligations of licensees, and all of the exhibits attached thereto, and that he is familiar with the terms and provisions thereof. In response thereto, the applicant hereby acknowledges that he is submitting this application to be a licensee for the Product in the territory assigned with the full intent to actively engage in the marketing of such Product and, notwithstanding any tax benefits to be derived from entering into the Agreement, the applicant hereby represents that he is applying to become a licensee for the primary purpose of deriving profit from his own efforts in promoting the Product and that he fully intends to comply in good faith with the provisions of the Agreement requiring him to actively engage in promoting the Product. 2. He has sufficient knowledge and experience in business and financial matters or competent professional advice to evaluate the risks, obligations and attendant duties imposed on licensees by the Agreement. *451 3. He has sufficient business marketing experience so as to warrant Olympic's consideration as a licensee. 4. He has sufficient financial resources to effectively develop the territory assigned and to market the Product to the satisfaction of Olympic. * * * 8. The applicant hereby specifically acknowledges the following: (a) The exclusive license for the Product in the territory assigned is subject to the licensee's payment, in advance, of a twelve year distributorship fee as set forth in the Agreement. Under the terms of the Agreement, the licensee shall partially finance the twelve year distributorship fee. Under the terms of the financing plan set forth in the Agreement, the twelve year distributorship fee shall be paid partly by a negotiable promissory note secured by all of the licensee's right, title and interest in and to his undivided interest in the Patent, all as more fully described in the Agreement and the Security Agreement attached as Exhibit E thereto. In the event that the licensee defaults in the payments under such promissory notes, Olympic shall have all the rights of a secured creditor under the Uniform Commercial Code to foreclose against the above *452 described collateral which will result in the licensee's loss of his undivided interest in the Patent. (b) That he fully understands that the Survey is based upon certain assumptions which may prove to be incorrect and that he has independently evaluated the merits of acquiring a license and is not relying on the information contained in said Survey. (c) That he fully intends to actively promote the Product in the territory acquired to the satisfaction of Olympic, to meet his obligations under the Agreement and will not seek the assistance of any unrelated third party or entity in such efforts. (d) That he has been provided no information by representatives of Olympic or by any other person or entity as to (i) the manner in which he may develop demand for the Product or (ii) the availability of marketing assistance. (e) That, if the applicant is a partnership, corporation or other entity formed for the purpose of acquiring a license, the chief executive officer or general partner thereof will be allowed to acquire no more than three territories and the license to market the Product therein, and that no more than three licensees will be permitted to band together in whatever *453 manner to promote jointly the sale of the Product. (f) That, as a licensee, he will not be permitted to share revenues or expenses with any other licensee in the marketing network but must develop his own territory out of his own resources and his income is to be derived solely from such efforts in his territory. However, this does not preclude regional cooperation among licensees so long as expenses are reasonably allocated among the licensees and there is no sharing of revenues from the sale of the Product. (g) That he will not be permitted to use the name of Olympic, or its trademarks or trade names, or any derivation thereof, in his marketing of the Product. However, this shall not preclude marketing the Product in association with the trademark "Geostar". 9. The applicant understands that any discussion of the tax consequences involved in the acquisition of a license as set forth in the Survey, the Agreement, the Brochure, the Tax Opinion to Olympic of Himelrick, Gildar & Hilpert (Schedule 3 to the Brochure), or any other promotional material of Olympic, is general in nature, and that the tax consequences of acquiring a license depend on the particular circumstances of *454 the applicant. Further, the applicant understands that there can be no assurance that the Internal Revenue Code or the regulations thereunder will not be amended or interpreted in such manner as to deprive the applicant, and, if applicable, its investors, of some of the tax benefits otherwise obtainable. 10. The applicant understands that if his acquisition of a license is not motivated at least in part by the possibility of economic profit from his own efforts in promoting the Product, certain tax benefits to the applicant, and, if applicable, its investors, might be subject to challenge by the Internal Revenue Service and that whether the acquisition of a license has economic substance apart from anticipated tax benefits is essentially a factual question and depends primarily on the subjective motivation of the applicant to actively promote the Product. The applicant and his advisors certify that they have independently determined that there is a realistic anticipation of profits from the operation of the license territory. * * * 12. The applicant further hereby acknowledges that no officer, director, shareholder or promoter of the applicant has or will receive any consideration, *455 whether in the form of commissions, consulting fees or of any other kind, from any person or entity associated with the establishment of the license marketing network or in any way related to Olympic or its agents, servants or employees. 13. The applicant is also aware of and understands the following: (a) Olympic has no financial or operating history and, further, that the acquisition of a license is a speculative acquisition which involves a high degree of risk of loss by the undersigned. (b) Although Ta-chin Aluminum Industry Co., Ltd. ("Ta-chin") has agreed with Olympic to manufacture or cause to be manufactured the Product, Ta-chin is not contractually bound to produce a given amount of the Product or for a stated period of time. However, Ta-chin has represented that it can fulfill the projected manufacturing requirements of the Product. * * * (c) The officers, directors and shareholders of Olympic and their affiliates will receive substantial compensation in connection with the acquisition of the United States patent rights to the Product and the establishment of the license marketing network. (d) The anticipated economic results set forth in the Survey, the Brochure *456 and other materials provided the applicant by Olympic are based upon estimates, assumptions and forecasts of Olympic, and some of the assumptions may have been arbitrarily chosen and the anticipated economic results are, therefore, not guaranteed by Olympic. (e) The distributorship fee, payable by the applicant as described in the Agreement, will not be used by Olympic, or any affiliate or control person thereof, to develop the Product, to promote demand for the Product, to make any payments to the manufacturers of the Product or to provide marketing assistance to the applicant. Funding of promotional effort to exploit the territory is the sole responsibility of the licensee and Olympic is relying on the applicant's certification in paragraph 4 above that he so understands and is committed to such effort. Notwithstanding anything herein to the contrary, certain affiliates and/or control persons of Olympic may engage in promotional activities concerning the trademark "Geostar" which may indirectly benefit the applicant. (f) There is no guarantee that a patent for the Product will be issued and, in fact, there is a substantial risk that one will not be issued. (g) He is not and *457 will not be acting under any marketing directions or pursuant to any marketing plan or system of Olympic or in reliance thereon. The applicant will formulate an independent marketing plan or system to best meet his business objectives. As used in this paragraph, the phrase "marketing plan or system" is used in its broadest sense to include advertising, promotion, sales solicitation, credit, billing, collections, rebates, refunds, returns, warranties, guarantees, representations, hours and places of business and all other aspects of product marketing.
The "Product" referred to in each petitioner's application and distributorship agreement was the Geostar racquetball racquet. The "partial recourse promissory note" for $ 192,500 that each petitioner signed provided, in part, as follows: This Note is secured by a Security Agreement between Maker and Payee and the terms and conditions of said Security Agreement are incorporated herein by reference. In the event of a default by the Maker under this Note, the maturity of this Note shall be accelerated and the Payee shall be entitled to enforce its rights as set forth in the Security Agreement, provided, however, that the Maker *458 shall have a grace period of 30 days in which to cure any default. The Maker shall be personally liable for payment of $ 20,000 of this Note, and all payments received on this Note whether pursuant to the terms hereof or otherwise, shall first be applied to reduce the principal amount for which the Maker has personal liability. The Maker shall not be personally liable for payment of the balance of the principal amount of this Note nor interest on this Note and the sole remedy of the Payee to collect such amounts at maturity (or in the event of default hereunder) shall be to enforce its rights under the Security Agreement and Payee or the holder of this Note shall not seek any deficiency or other personal judgment against Maker, with respect to the principal amount for which the Maker is not personally liable and interest. The "Security Agreement" referred to in the Note provided, in part: 1. Licensee hereby grants and conveys to the Secured Party a security interest and mortgage to all of the Licensee's right, title and interest in and to his undivided interest in the patent application set forth in Exhibit 1 and all patents issuing thereon (collectively "the Patent"), which *459 patent grants the Licensee certain rights in the Patent in the territory described in Exhibit 2. Further, this Security Agreement is made and delivered in accordance with Section 4(a) of that certain Exclusive License Agreement dated 12/9, 1980 between the Licensee and the Secured party (the "Agreement"). The interest of the Licensee in the patent is hereinafter sometimes referred to as "Collateral." This security interest is granted to the Secured Party to secure payment of those certain recourse and nonrecourse notes made by the Licensee, payable to the Secured Party, with interest as therein provided on the unpaid balance thereof presently or hereafter owing, the recourse note being due on the first day of March, 1981, and the partial recourse note being due on the 31st day of May, 1990 (said notes, including any and all other liabilities of the Licensee to the Secured Party, due or to become due, now existing or hereafter arising, and costs connected therewith, hereinafter are referred to as the "Obligations"). * * * 15. Nothing contained herein shall obligate the Licensee further than to bind the right, title and interest of the Licensee in and to the Collateral, and on *460 default hereunder no deficiency or other personal judgment shall be rendered or entered against the Licensee. [6]
In addition to all of the above documents, there was an "Exclusive License Agreement" between Olympic ("the company") and each petitioner. In pertinent part, each Exclusive License Agreement stated: PREAMBLE For the sole purpose of selling, promoting and otherwise distributing racquetball racquets (the "product"), patent application identified on Exhibit "A" and any patents issuing thereon (the "Patent") in the territory set forth in Exhibit "B" (the "Territory") for a period of twelve years from the date hereof. In consideration therefor, the Licensee shall pay to the Company a twelve year distributorship fee, as set forth in Exhibit "B". AGREEMENT 1. Grant of License. The company hereby conveys to the Licensee the exclusive right and license to utilize the Patent in the Territory in connection with the sale, promotion in and distribution of the Product. This is a restricted license *461 that the Patent may not be used in connection with any product other than racquetball racquets; nor may it be used for any purpose other than the sale, promotion and distribution of racquetball racquets. The license is for a twelve year period commencing on the date hereof and subject to termination as hereinafter provided. The right to manufacture the Product is reserved to the Company. * * * 9. Assignment. This Agreement and the rights granted hereunder may not be assigned in whole or in part by the Licensee without the prior express written consent of the Company. Petitioner Zane viewed his overall obligations under the plan as requiring him to pay a maximum of $ 27,500, with the payment of $ 20,000 of that sum postponed for a period of ten years. Zane thought that a ten-year period was a substantial amount of time within which to make sufficient money by selling racquetball racquets under the Geostar program to pay off his investment ($ 27,500) and still make some profit. In April of 1981 Zane received from Geostar an announcement that one Charlie Brumfield (Brumfield) had been hired as vice president in charge of sales. Brumfield at the time was one of the best know *462 professional racquetball players in the United States. The addition of Brumfield to the Geostar staff made Zane feel very comfortable with his investment. During 1981 Zane talked to his nephew, a college student, about working with college friends to sell the Geostar racquet on college campuses. In July of 1981 Zane received a copy of Racquetball Illustrated magazine. On the back cover of that magazine appeared a full-page advertisement promoting the Geostar racquetball racquet, complete with a picture of the Geostar 357 racquet, a picture of Rovinsky, and a picture of Brumfield. Upon receiving the issue of Racquetball Illustrated demonstratinng that Geostar had embarked upon a national advertising campaign, Zane became "increasingly more optimistic" about the nature of his investment. Zane also signed an application to have a Geostar sales representative work in his (Zane's) territory. At the same time it hired Brumfield, Geostar also issued to its distributors a price sheet which provided wholesale prices to be provided to chain stores and to pro shops. At the bottom of the price list, which was on Geostar Tennis Products stationery, was a note to distributors indicating *463 that the prices for both tennis and racquetball racquets were supplied to "Manufacturer's Reps." The note explained to the distributors that they would receive profits from sales made by such manufacturer's reps in the distributor's territory. The note further explained that the distributors would pay only ten percent of a commission paid to the manufacturer's reps and that Geostar would pay the balance. The note further explained that 15 percent of the gross receipts would be retained by Geostar on the manufacturer's reps sales, to be applied against the partial recourse promissory note signed by the distributors in payment for their distributorships. In the summer of 1981, however, Zane had a problem in acquiring any racquetball racquets to be sold. He had received one or two sample racquets. His attempts to acquire more were unavailing. These difficulties in receiving the product, however, did not surprise Zane; he was familiar with the fact that some technical problems could arise in the development of a new product which would preclude its ready availability. On June 18, 1981, Rovinsky sent to Nicholson, Zane and Liberty's advisor, a letter on Geostar Tennis Products stationery *464 indicating that Brumfield had completed "our new design of the Brumfield Line Racquets" which would be on the market approximately 120 days after June 18, 1981. The record is not wholly clear whether the Brumfield Line Racquets used the tri-radial stringing pattern of the pending Geostar patent, but apparently this was just another version of the Geostar 357. The letter further advised that Geostar was sending out promotional literature to over 1,500 racquetball clubs and further that Geostar expected a minimum volume of 50,000 to 75,000 racquets sold within the next nine months following June 18, 1981. On Nicholson's advice, Zane in 1981 had his wife, Barbara, obtain a New Jersey "Business Name Certificate" for an entity known as "Zane Geostar Racquets." Zane also opened a business checking account for Zane Geostar and had his wife, Barbara, obtain an Employer Identification Number from the Internal Revenue Service. He did not, however, keep separate business records for Zane Geostar because, as he pointed out, he had no product to sell, either the Geostar 357 racquetball racquet or the supposedly new Brumfield line. In January of 1982, Zane received a letter from Rovinsky *465 on Olympic Sports Products, Inc. stationery which read as follows: January 27, 1982 Dear Licensed Territory Owner: ZANE We are pleased to tell you that we are giving you, at no additional cost, an additional territory. If you are presently a Racquetball Territory Owner, you will receive a corresponding Tennis Territory. If you already own a Tennis Territory, you will receive a Racquetball Territory. If the Racquetball Territory that corresponds to your Tennis Territory is already owned, you will be given another Racquetball Territory and your Tennis Territory will be matched to that. We are doing this as an added incentive to increase your profit potential. We apologize for the delay of the marketing of the Geostar racquets, but we felt it was necessary that the proper product was on the market. The new advertising starts in this coming month's Racquetball Magazine and next months [sic] Racquetball Illustrated Magazine. Also, there will be additional creative advertising to promote your sales. We appreciate your patience and confidence and we guarantee the most enthusiastic effort for this to be a successful venture for you. Yours truly, /s/ Elliot Rovinsky Elliot *466 Rovinsky President - Geostar Sports Products, Inc. YOUR LICENSED TERRITORY WAS NJ-102 Racquetball
YOUR NEW TERRITORIES ARE NJ-102 Racquetball & Tennis
Between the middle of 1980 and the middle of 1982, Geostar had received numerous complaints about the quality of its tennis and racquetball racquets. As a result of the defective racquet problems, petitioner Zane received an undated letter, apparently written prior to February of 1982, from Olympic Sports Products which stated as follows: TO: ALL LICENSED TERRITORY OWNERS Due to the unfortunate problem that we have had with defective racquets, which caused Geostar Sports Products to have to pull those particular racquets off the market, we have been forced to reengineer and design new racquets. These new racquets will become marketable in February of 1982. Since the occurrence of this dilemma, we will renew all territories from February of 1982. We will extend all licensing rights and notes as of February of 1982. We now have the quality racquets necessary to make our efforts truly successful. These racquets have been designed with the exclusive design of Charlie Brumfield, Vice-President of Geostar Sports Products, *467 Inc. Yours truly, /s/ Frank Joy Frank Joy President- Olympic Sports Products, Inc.
In June of 1982, Geostar's attorney, Richard G. Himelrick, wrote the racquet manufacturer, the Ta-Chin Aluminum Company in Taiwan, complaining of the defective tennis and racquetball racquets. The letter stated as follows: June 17, 1982 Mr. Eugene Hong Ta-Chin Aluminum Industry Co., Ltd. 113 Tu Cheng Road, Ta Ki Hsiang Taichung Hsien Taiwan, R.O.C. P.O. Box 742 Taichung, Taiwan Re: Geostar Sports Products, Inc.
Dear Mr. Hong: This office represents Geostar Sports Products, Inc., which on various occasions has purchased racketball and tennis rackets manufactured by your company. The rackets have proved defective. To date, 34 of the tennis rackets and 13 of the racketball rackets have been returned due to the handle frame breaking. I enclose a picture showing the nature of the break. The defects in your rackets have been seriously detrimental to Geostar's business. Apart from complaints from dissatisfied customers, a number of retail outlets have refused to continue carrying Geostar rackets. As a result, Geostar wishes to rescind the purchases it made and recover *468 from you the price it paid for rackets it holds in inventory. The company is also entitled to reasonable compensation for the damage your product's defects have caused its operations, good will and tradename. Solely as a matter of settlement, Geostar is willing to settle its accounts with you in return for payment of $ 24,735.40, computed as follows: [Listing of various tennis and racquetball racquets and amounts] * * * In addition to the foregoing, Geostar will require a written assurance from Ta-Chin that it will reimburse Geostar for its purchase cost on any further rackets that are returned. Geostar will return C.O.D., or in such other manner as Ta-Chin may desire, all damaged rackets and rackets held by it in inventory. Geostar wishes to resolve this matter on an amicable basis. I am open to discussing the matter directly with you or your attorney. Alternatively, you may speak directly with Mr. Elliot Rovinsky. Obviously, if the matter can not be resolved, we will be forced to initiate legal proceedings in which the damages requested will be substantially higher. Please let me hear from you by July 1, 1982. If I have received no response by then, I will *469 assume that more formal collection efforts are necessary. Sincerely yours, HIMELRICK, GILDAR & HILPERT /s/ Richard G. Himelrick
Richard G. Himelrick
RGH/MM Enclosure CC: Mr. Elliot Rovinsky Mr. John Su In the meantime, Geostar had proceeded with a program whereby the distributors would provide financial support to a national advertising program. In November of 1981, Geostar sent to the distributors the following letter: TO: ALL LICENSED TERRITORY OWNERS GEOSTAR is very excited to announce a Co-advertising Program that all Licensed Territory Owners should participate in. Since there are a large number of territories sold, the cost of this advertising will be minimal and the exposure will be to the maximum. GEOSTAR will be advertising in the major sporting goods publications that are distributed Nationwide. Each participant will have their name appear on each Ad involved in this Co-advertising Program. Your name will appear or the name and address that you have or will have submitted as the name and address for inquiries concerning Geostar products for your territory. In each Ad as a distributor for Geostar, which will show the intent of your interest in *470 making a profit in the sales of the Geostar racquets. [sic] Each participant will receive copies of each publication that their Ads appear in, also literature concerning our racquets and sales packages. The cost to each Licensee will be determined by the cost of his territory. The monthly fees will be paid for a period of 90 days in advance for which Geostar will bill you directly. We appreciate your cooperation and confidence in our operation and I am sure you can realize the advantages that this Program offers you as a Licensed Territory Owner. Yours Truly, /s/ Elliot Rovinsky Elliot Rovinsky President - Geostar Sports Products, Inc. ER:rn Enclosures: Fee breakdown schedule
In response to this letter, Zane, in January 1982, sent a check to Rovinsky for $ 66 to participate in the advertising program. In his letter enclosing the check, Zane stated, "Also, please forward two sets of your new racquets -- I have not received any of these." (Emphasis in original.) Later in January of 1982, Zane received another letter from Rovinsky urging distributors to participate in the co-advertising program. Zane returned a copy of that letter to Rovinsky, having *471 written upon it a note which stated that Zane had already sent in his money for the advertising and further stating, "Also, I am still waiting for racquets requested. Thank you -- any problems or discrepancy please contact me. Sincerely, Rich Zane." Thereafter in the February 1982 edition of the magazine Racquetball Illustrated, Geostar ran a full-page ad in which racquetball professional Charlie Brumfield endorsed the Geostar 357 racquet with the tri-radial design. This is the same racquet that had been advertised in the July 1981 Racquetball Illustrated, but apparently it is the purported "new" Brumfield racquet. The advertisement contained an order form whereby a reader could order one of the Geostar racquets for a special price of $ 39. At the bottom of the ad were listed the Geostar distributors. [7]
*472 Zane received periodic reports during 1982 reflecting sales activity in his territory. One report indicated that there had been no racquetball or tennis racquet sales in Zane's New Jersey territory through March 31, 1982. A later statement prepared by Olympic indicated that Zane realized no proceeds from either racquetball or tennis racquet sales in the territory for the quarter ended June 30, 1982, but that he had realized "advertising" profit on sales in other areas of $ 8.20 in that territory, of which $ 2.65 was used to reduce his "partial recourse" note. For the quarter ended September 30, 1982, Zane received a document indicating that his share of gross proceeds for sales in "unowned" territories was $ 17.85, of which $ 2.68 had been applied to reduce his obligation on the partial recourse promissory note. In October of 1982 Zane again wrote to Rovinsky sending more money for the co-advertising program. In that letter he also asked, "Please forward to me six (6) of your newest Geostar racquets * * * at the above address." Zane never received the racquets. In addition to writing, Zane made a number of telephone calls to Nicholson or Geostar headquarters expressing his concern *473 and frustration at not being able to get racquets as samples for sale. By late in the fall of 1982, however, Zane was concerned that his liabilities on the note to Geostar would put him in a "bad financial position" because of his obligation to repay the note to Geostar. Zane received another document indicating that there had been no credits of any sort for his territory in the quarter ended December 31, 1982. Zane still felt that he was obligated for the $ 20,000 personal liability portion of the $ 192,500 partial recourse promissory note. (Presumably he would subtract the $ 5.33 already credited; the record shows no other payments on that note.) Zane indicated that, although he felt obligated to repay that $ 20,000, he may have had a legal defense to a demand for such payment, based upon Geostar's failure to provide him with racquets to sell. He nevertheless pronounced himself ready, willing and able to proceed but for the lack of a product to sell; he did not want to risk his reputation by selling a product he could not deliver. Zane has not heard from Rovinsky since 1982. Since his investment in 1980, petitioner Zane has made the following de minimis profits from his *474 distributorship, all of which emanated from a cooperative advertising program initiated by Rovinsky, president of Geostar. Sales
Amount Applied to
in
Distributive Share
Partial Recourse
Quarter Ending
Territory
Other Sales
Promissory Note
03/31/82
None
$    -0-
$ -0- 06/30/82
None
8.20
2.65
09/30/82
None
17.85
2.68
12/31/82
None
-0-
-0- Liberty's experience with the Geostar program continued to parallel Zane's. Like Zane, petitioner Liberty believed that he could pay off his obligation with sales over the ten-year term of the note. He was sure he could do so at least with respect to the $ 20,000 to which he had agreed to become personally liable. He candidly admitted that he did not think the $ 172,500 balance of the "partial recourse" note could realistically have been paid off by sales of the Geostar racquet, but that was of no concern to him since, pursuant to the agreement, payment on that portion of the note were to come only from earnings on sales of the racquet. Liberty started with a New Jersey territory like Zane, but when in 1982 Geostar began offering the holders of racquetball territories free tennis racquet *475 distributorships, Liberty's territory was switched to Rochester, New York where he was given both the racquetball and the tennis distributorships for the Geostar racquets. [8]
Like Zane, Liberty thought that the business would start slowly until Geostar picked up endorsements by professional players and the national advertising program got into full operation. Liberty was encouraged by Geostar's prospects when in 1981 Geostar added Brumfield to its management. On Nicholson's advice, Liberty and his wife in 1982 obtained *476 a New Jersey Certificate of Trade in the name of "Liberty Geostar racquets." His wife also applied for an Employer Identification Number for the Liberty Geostar racquets operation. Although Liberty apparently did not open a separate bank account for his Geostar business, he did maintain a set of books and records which reflected the negligible economic activity of his franchises. Liberty also participated in the Geostar national advertising program; in 1981 and 1982 he paid some $ 462 for advertisements for his two New York distributorships. His name did appear in such advertisements. Like Zane, petitioner Liberty also ran into a supply and defective racquet problem. In fact his own racquetball racquet broke during use. Liberty relied upon Geostar to supply the product, and made a number of oral requests to be sent racquets, but none were ever received. Based upon his experience with IBM, Liberty thought that a direct mail campaign would be a successful means of marketing the Geostar racquets. Liberty had no personal plans to promote the racquet sales himself, because of the demands of his position with IBM. He instead planned to contract with Zane or someone else to administer *477 the territory; Liberty thought that Zane had more time to spare. Although Liberty was aware that Zane had filled out an application for a representative to work Zane's territory, Liberty himself received no such application. Despite his lack of Geostar racquets to sell, Liberty pronounced himself "ready, willing and able" to proceed if he could get the product even at time of the trial in this case. Since his investment in 1980, petitioner Liberty has made the following de minimis profits from his distributorship, all of which emanated from cooperative advertising initiated by Rovinsky of Geostar. These profits were reported by Olympic in quarterly reports as follows: Sales
Amount Applied to
in
Distributive Share
Partial Recourse
Quarter Ending
Territory
Other Sales
Promissory Note
03/31/82
None
$  9.90
$ 2.55
06/30/82
None
8.20
2.65
09/30/82
None
10.50
2.68
12/32/82
None
-- -- Nicholson also sold two Geostar territories to a John Payson (Payson). Payson is a resident of Roxbury, Connecticut. He is a graduate of Yale University and at the time of trial was a vice president of Milton Bradley Corporation, a large manufacturer *478 of toys. Payson headed MB Communications, that company's in-house advertising agency. Late in 1980 Payson discussed with Nicholson a direct response marketing program for Geostar racquets -- that is, a television advertisement campaign in which the viewer is invited to respond directly to an offer to buy a product by writing to a post office number. The viewer would then, having sent in his money, get the product by return mail. Nicholson had indicated to Payson that a number of Nicholson's other clients were "marketing men." Payson paid little attention to the marketing study contained in the Geostar brochure because he had prepared his own marketing plan. Payson met with Rovinsky in November of 1980. At that time Rovinsky discussed plans for national advertising, including print advertising in racquetball magazines. Rovinsky also discussed the possibility of hiring Brumfield, the high ranking racquetball professional, to represent Geostar products. Payson asked Rovinsky whether a substantial inventory of racquets would be available and Rovinsky assured him that it would be. If his program had been successful, Payson contemplated profits of $ 130,000 on $ 1 million in retail *479 sales. These proceeds would be divided among the various distributors who would agree to join Payson in his program. Late in 1981, Payson sought to obtain on consignment between ten and 15 thousand racquets from Rovinsky before starting off his program. Rovinsky, however, balked at supplying that many racquets on consignment, that is, without any assurance that the racquets would be sold and not returned to him. Sports products normally are not supplied to distributors on a consignment basis, but must be purchased outright. When he could not get the requested racquets on consignment, Payson abandoned the idea of a direct response campaign. Although very experienced in the advertising field generally, Payson had no experience in direct mail response advertising programs. [9] Such direct mail response advertising programs usually involve items that are less expensive that the Geostar racquet. *480 Nicholson earned commissions, payable to his AMN, Inc. corporation, of between ten and 20 percent of the cash paid by his clients for the Geostar distributorships. Eldredge received half of those commissions. At time of trial, Nicholson had not heard from Rovinsky since late 1982 or 1983, and presumed that Rovinsky had been avoiding him. Sometime near the end of 1982 or in early 1983, Olympic apparently ceased to exist as a viable entity. It apparently never had offices separate from Geostar, however, and was only active in selling Geostar distributorships for the years 1980 and 1981. Frank Joy did not get a salary for his duties as an officer of Olympic. Frank Joy, Olympic's sole shareholder and president, did not come to the office regularly and at some point retired and in 1982 moved to Kansas. He died early in 1984. In 1982 Rovinsky had obtained a power of attorney to act for Olympic in the conduct of its affairs with the Internal Revenue Service, but at the time of the trial there was no one authorized to represent Olympic. If Olympic is still in existence, it is an inactive corporation. Geostar itself changed its program in late 1982. It had twice redesigned the *481 racquets with the tri-radial stringing pattern without eliminating the problems. It then abandoned the tri-radial stringing pattern which had been the subject of Rovinsky's patent, and the patent for that stringing process was no longer being actively pursued at the time of the trial. In the autumn of 1982, Rovinsky made contact with a firm known as Richcraft, Inc., of Burbank, California (Richcraft). Rovinsky ordered a line of racquetball racquets that had been developed by Richcraft. These Richcraft racquets had either the traditional stringing pattern or the so-called sunburst stringing pattern which is unrelated to the tri-radial pattern. All of the racquets in Geostar's model line thereafter were in fact models produced by Richcraft for a variety of customers. The models of racquets differed only with respect to the "cosmetics," that is, the name and the decoration appearing upon the racquet. Richcraft operated as a domestic "job shop" which produced racquets for most of the major racquet manufacturers. Richcraft continued manufacturing racquets for Geostar on a day-to-day basis as needed from the end of 1982 through March of 1984. Geostar, in fact, was one of Richcraft's *482 smaller customers. Richcraft had the capacity to manufacture 10,000 racquets per month, but Geostar ordered a total of only 7,300 racquets for the entire period. The inventories of Geostar racquets that had the tri-radial design were either sold through an Arizona publication called the "Penny Saver" at bargain basement prices, or they were donated to charity. Beginning in 1982 Geostar stopped selling any tennis racquets whatsoever. Rovinsky testified, however, that Geostar was planning to build a plant and do its own manufacturing operation in the future, which would result in the production of tennis and racquetball racquets. However, there is no suggestion in the record that Geostar will ever produce a racquet with the tri-radial stringing pattern. [10] At the time of trial, Rovinsky's plans were to manufacture a composite graphite-fiberglass racquet with the same kind of sunburst stringing pattern that Richcraft had been producing for Geostar. *483 During 1980, when petitioners invested in the Geostar program, the principal feature of the program was the Geostar 357 racquet that featured the tri-radial stringing. This racquet was an aluminum racquet that provided more torque or turning force than other stiffer racquets. It was also, however, priced higher than many other comparable racquets. [11] Moreover, it was not comparable in quality to the graphite or graphite-composition racquets that were used by more advanced players and professionals. Even if it had not had latent manufacturing and design defects, the Geostar 357 racquet would have been appropriate only for beginners and perhaps for women players. The Geostar 357 racquet gave the player more control but it significantly reduced power, and power is more important in racquetball than control. It is highly unlikely that this racquet could have competed favorably with other competing brands on the market in 1980 or 1981 absent mass media advertising substantially greater than the advertising in specialty publications that took place. Moreover, the projections in Geostar publications of 14 million persons playing racquetball in 1980 did not comport with the actual number *484 of players which was closer to 8 million than 14 million. The popularity of racquetball also peaked in the year 1980 and after that there was no longer an active demand for the construction of new racquetball courts. Indeed the market was glutted with owners of racquetball courts trying to sell them by 1980. Petitioners' rights to sell Geostar racquetball racquets in their respective territories in 1980 were worth no more than the $ 7,500 cash each had invested by April of 1981. Olympic has never foreclosed on either the recourse notes or the "partial recourse promissory notes" of any of the licensees. Instead, Olympic has taken back a number of territories and released the individual licensees of all liability on all recourse, partial recourse, or nonrecourse notes. In general, if a licensee could not pay the note and wished to forfeit the territory, an agreement in release would be signed by the licensee releasing the territory and all notes would be forgiven. [12] *485 On their tax returns for the year 1980, petitioners Zane and Liberty each deducted $ 20,000 as the first year's amortization of the distributorship fee of $ 200,000 over a ten-year period pursuant to the provisions of section 1253. Each had no income and no other expenses associated with the distributorship for that year. The Commissioner of Internal Revenue disallowed those deductions. Petitioners timely filed petitions in this Court for redetermination of the resulting deficiencies. ULTIMATE FINDINGS OF FACT 1. Petitioners Zane and Liberty entered into their Geostar distributorships in 1980 with an actual and honest profit objective pursuant to section 183. 2. Petitioners *486 Zane and Liberty are entitled to deduct one-tenth of the "principal sum" paid for their Geostar franchises pursuant to section 1253. 3. Each petitioner's "principal sum" is $ 7,500, consisting of the $ 5,000 cash and the $ 2,500 short-term recourse note paid, but not including the $ 192,500 represented by the "partial recourse promissory note" which was too contingent or speculative to be included as part of the principal sum. 4. Each petitioner was "at risk" within the meaning of section 465 with respect to his Geostar distributorship to the extent of $ 7,500. OPINION In 1980, petitioner Zane and Liberty each purchased a Geostar racquetball racquet franchise. In exchange for cash and notes totaling $ 200,000, each received the right to sell Geostar racquetball racquets in his territory for a period of 12 years. For each such franchise each petitioner made a cash down payment of $ 5,000 at the time he submitted his application and signed a "recourse note" due on March 1, 1981 for an additional $ 2,500. Each petitioner subsequently paid that recourse note. Each petitioner also signed a "partial recourse promissory note" in which he promised to pay an additional $ 192,500 *487 after ten years. Under the terms of this partial recourse promissory note, some 15 percent of the gross receipts from sales of racquetball racquets was to be applied towards payment of the partial recourse promissory note. In that note each petitioner also promised to be personally liable for $ 20,000 of the $ 192,500 total. The balance, some $ 172,500, and all interest could be collected only from earnings from sales of racquetball racquets in each petitioner's given territory or by foreclosure upon his distributorship. On his tax return for 1980, the year of purchase, each petitioner claimed an amortization deduction under section 1253 of $ 20,000, representing one-tenth of the $ 200,000 "purchase price" for the Geostar racquetball racquet franchise. Respondent disallowed those deductions. Respondent's broad assault on petitioners' racquetball racquet distributorship investment includes several overlapping and alternative arguments. Respondent's profit-objective argument, if accepted, would be wholly dispositive of the case before us. We will therefore first address the issue whether the Geostar distributorships were activities not engaged in for profit within the meaning *488 of section 183. [13]
*489 Whether an activity is engaged in for profit turns on whether the taxpayer entered into or carried on the activity with an actual and honest objective of making a profit. Elliott v. Commissioner,90 T.C. 960 (1988); Dreicer v. Commissioner,78 T.C. 642 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983); Engdahl v. Commissioner,72 T.C. 659, 666 (1979); Golanty v. Commissioner,72 T.C. 411, 426-427 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981). [14]
As this Court has previously stated, section 183 is not a disallowance provision, but rather allows a taxpayer to deduct certain expenses that he could not otherwise deduct. Fox v. Commissioner,80 T.C. 972, 1006 (1983), affd. without published opinion 742 F.2d 1441 (2d Cir. 1984), affd. sub nom. Barnard v. Commissioner,731 F.2d 230 (4th Cir. 1984), affd. without published opinions sub nom. Hook v. Commissioner, Krasta v. Commissioner, Leffel v. Commissioner, Rosenblatt v. Commissioner, Zemel v. Commissioner,734 F.2d 5, 6-7, 9 (3d Cir. 1984); *490 Brannen v. Commissioner,78 T.C. 471, 500 (1982), affd. 722 F.2d 695 (11th Cir. 1984). If an activity is not engaged in for profit, section 183(b) separates the claimed deductions into two groups. Section 183(b)(1) allows only those deductions which are not dependent upon a profit objective, e.g., interest and taxes. Section 183(b)(2) allows the balance of the deductions which would otherwise be permitted only if the activity was engaged in for profit, but only to the extent that the gross income derived from the activity exceeds the deductions allowed under paragraph (1). During the only year before the Court, 1980, petitioners' distributorships had no gross income, and their sole claimed deduction of $ 20,000 each was for amortized franchise fees. If we find the Geostar distributorships were activities not engaged in for profit, no part of this $ 20,000 would be allowable as a deduction under section 183(b). Petitioners thus must establish that they entered into their Geostar distributorships with an actual and honest profit objective. Fox v. Commissioner, supra,80 T.C. at 1006; Dreicer v. Commissioner, supra,78 T.C. at 644-645. *491 While a reasonable expectation of profit is not required, petitioners must have had an actual and honest objective of making a profit. Sec. 1.183-2(a), Income Tax Regs.; Beck v. Commissioner,85 T.C. 557, 569 (1985); Flowers v. Commissioner,80 T.C. 914, 931 (1983); Dreicer v. Commissioner, supra,78 T.C. at 644-645; Allen v. Commissioner,72 T.C. 28, 33 (1979); Bessenyey v. Commissioner,45 T.C. 261, 274 (1965), affd. 379 F.2d 252 (2d Cir. 1967). The issue is one of fact to be resolved on the basis of all the surrounding circumstances. Beck v. Commissioner, supra,85 T.C. at 570; Flowers v. Commissioner, supra,80 T.C. at 931-932; Lemmen v. Commissioner,77 T.C. 1326, 1340 (1981); Dunn v. Commissioner,70 T.C. 715, 720 (1978), affd. 615 F.2d 578 (2d Cir. 1980). Petitioners have the burden of proving the requisite profit objective. Rule 142(a); Beck v. Commissioner, supra; Flowers v. Commissioner, supra;Golanty v. Commissioner, supra,72 T.C. at 426. In making this factual *492 determination, we give greater weight to objective factors than to the taxpayer's mere statement of his intent. Sec. 1.183-2(a), Income Tax Regs.; Beck v. Commissioner, supra; Flowers v. Commissioner, supra;Siegel v. Commissioner, supra,78 T.C. at 699; Churchman v. Commissioner,68 T.C. 696, 701 (1977). Section 1.183-2(b), Income Tax Regs., lists some nine of the relevant factors to be considered in determining whether an activity is engaged in for profit. [15] However, all nine factors do not necessarily apply in every case, and those that do not need not be discussed where no purpose would be served. See, e.g., Waddell v. Commissioner,86 T.C. 848 (1986), affd. 841 F.2d 264 (9th Cir. 1988). *493 On this record we are convinced that petitioners acquired their Geostar distributorships with the requisite profit objective. Petitioners were sophisticated businessmen with IBM; both were experienced in sales. The Geostar program was brought to their attention by Arthur Nicholson, their financial advisor, and by his associate and their former colleague at IBM, Richard Eldredge. Petitioners were aware that Nicholson had gone to Arizona and had personally investigated the Geostar program. Petitioners obtained sample racquets. They learned from Nicholson that he had seen the operation, that he had verified that the Geostar program was in place, and that he considered it to have a direct mail capability consistent with other successful businesses. Petitioners knew that Nicholson vouched for Mr. Rovinsky, the promoter, and Rovinsky's apparent capabilities in supplying the Geostar racquets. They heard from Nicholson of Rovinsky's plans for aggressive promotion of the Geostar racquetball racquet program, including the establishment of a system of manufacturer's representatives throughout the country, and a program for cooperative advertising whereby the distributor would have their *494 names mentioned in conjunction with advertisements placed by Geostar. Nicholson also told petitioners that there would be national advertisements by Geostar in specialty publications, and finally, that Geostar planned to hire a "name" racquetball professional to represent the Geostar racquets. In at least some fashion, each of these representations was fulfilled in the years after 1980. [16]
*495 Petitioners, moreover, did not accept the representations made by Geostar, or by Nicholson about the Geostar program, with the indifference of investors who are only interested in the tax advantages of a program. To the contrary, Zane and Liberty, as experienced salesmen, each viewed with skepticism the ambitious projections of profitability for the Geostar program. Each petitioner in fact performed his own analysis of that program. Each petitioner separately concluded that utilizing more conservative projections, he could still make an economic profit on Geostar sales even at prices or levels of sales far less than those projected in the Geostar materials. [17]
*496 In addition, each petitioner had his own ideas about utilizing his personal efforts or background in sales in promoting the product in addition to those marketing initiatives that Geostar would put forth. Zane considered contacting retail outlets in his area and also enlisting college students as salesmen who would sell racquets on campus on a commission basis. Liberty for his part thought a direct mail campaign would be effective, although he also planned to utilize Zane's efforts and expertise in this area. Each petitioner also brought some knowledge of the sport to his investment. Each was familiar with the sports of tennis and racquetball, each having been a player of those sports, and having observed the growth of racquetball in the preceding years. Moreover, each was impressed with the marketing potential of the tri-radial stringing pattern featured in the Geostar racquet. Petitioners thought they had something "unique" that would give them an edge in their territory's racquet market. [18] Moreover, although each was familiar with and personally engaged in the sport of racquetball, the activity in which each invested was selling racquets, an activity not designed *497 to yield much in the way of personal pleasure or recreation. From petitioners' standpoint, the prospect of making a profit did not seem to be farfetched. The documents supplied to them by Nicholson indicated that they could anticipate a profit of approximately $ 18.75 per racquet plus an additional payment (to be applied first to their $ 20,000 "personal" obligation) of $ 6.75 per racquet. In their view their total personal obligations over ten years would have been the $ 7,500 cash and short-term recourse note paid at the beginning of the distributorship, with the $ 20,000 of "personal" liability on the partial recourse promissory note to be paid at the end of the ten years -- or a total of $ 27,500. See n.17, supra. Over the ten-year period, the annual earnings required to pay off their liabilities would have averaged $ 2,750 per year. If figures remained constant, this meant *498 that a sale of 108 racquets per year would have sufficed to pay off these liabilities. [19] Sales of another 100 racquets per year would have amounted to additional "part-time" income of almost $ 2,000 per year. Each petitioner might reasonably have assumed that he could sell at least 108 racquets per year in his territory and perhaps more. A few of the factors mentioned in the regulations might tend to indicate an absence of the requisite profit objective here, such as petitioners' deduction of $ 20,000 in franchise fees in 1980 based on a total purchase *499 price of $ 200,000. The fact that petitioners claimed such deductions, although wholly inconsistent with their position in this proceeding, is not determinative. Petitioners, having paid $ 5,000 to Olympic in 1980, thereupon claimed a tax deduction of $ 20,000 for that year. However, petitioners now agree that they were each liable for no more than $ 27,500 on the investment rather than the $ 200,000 originally claimed. Thus, we no longer regard this case as a typical abusive tax shelter. See, e.g., Estate of Baron v. Commissioner,83 T.C. 542 (1984), affd. 798 F.2d 65 (2d Cir. 1986). Similarly the concurrent existence of other income against which any deductions from the activity may be used is not conclusive; it merely serves to pose the question. Here, in 1980, petitioners believed that they were risking $ 27,500 in cash and notes upon which they were personally liable, over a period of ten years. The promotional materials, however, indicated a maximum net tax saving (cash tax savings less cash costs) of $ 6,250. [20] As we stated in Engdahl v. Commissioner, supra,72 T.C. at 670: As long as tax rates are less than 100 percent, *500 there is no "benefit" in losing money. * * * The essential question remains as to whether there was a genuine hope of economic profit. * * * Nor is our determination that petitioners had the requisite profit objective undercut by the fact that the deductions were claimed with respect to what would be, at best, only a part-time job. It is well established that a taxpayer can be engaged in more than one trade or business at the same time. Curphey v. Commissioner,73 T.C. 766 (1980); Sherman v. Commissioner,16 T.C. 332, 337 (1951). In this case, each petitioner explicitly sought a source of supplemental income that would not interfere with the considerable demands made by his executive-level *501 position with IBM. Additionally, as set forth below, we have determined that petitioners' "partial recourse promissory note" is too contingent to be treated as a true indebtedness for Federal tax purposes. While we have considered that factor here, however, it is not determinative as to petitioners' profit objective. Indeed petitioners candidly admitted that they expected to pay only their "personal" liabilities -- that is, $ 20,000 of the $ 192,500 note. It is evident that they had a profit objective with respect to their perceived personal liabilities; the fact that the $ 172,500 balance of the note was too contingent to figure in their economic computations only reinforces our determination that petitioners entered into this business with the objective of making a profit. They expected to pay only the $ 27,500 total which they had invested and for which they believed themselves to be personally liable. Finally, we note that respondent's own expert witness's projections indicate that the taxpayers would fall only a few hundred dollars short in annual earnings of the amount needed to pay off the entire amount of the partial recourse promissory note. Although we have some *502 doubts as to the correctness of these projections (see n.3, supra), and although we realize that respondent's expert was merely utilizing some of petitioners' own figures, which he characterized as being "extremely optimistic," nevertheless we think it further serves to show that petitioners' hopes of earning a profit above their perceived personal liability of $ 27,500 were not wholly unrealistic. There were numerous deficiencies in the Geostar program, including the failure to supply racquets, the abandonment of the patent to the tri-radial stringing pattern, and the eventual disregard of petitioners who had each paid at least $ 7,500 to become distributors. We do not believe, however, that petitioners were aware of these problems at the time they invested. We believe that they reasonably relied upon the promotional materials and the rather superficial investigation of the Geostar program made by Nicholson. In view of the emergent weaknesses of the Geostar program, petitioners' belief that they could make a profit may not have been reasonable, but we are convinced that in 1980 they had an "actual and honest" profit objective for purposes of section 183. [21]
*503 Having determined that petitioners invested in their Geostar distributorships with "an actual and honest" profit objective, we must next determine whether, and to what extent, their investments are deductible pursuant to the provisions of section 1253. [22]
*504 Congress enacted section 1253 as part of the Tax Reform Act of 1969, effective for transactions after December 31, 1969. The provisions set forth the Federal tax ramifications attendant upon a transfer of a franchise. Section 1253(b)(1) defines a franchise as including "an agreement which gives one of the parties to the agreement the right to distribute, sell, or provide goods, services, or facilities, within a specified area." Petitioners' Geostar racquetball racquet franchises, which were for discrete geographic areas, met the statutory definition. Accordingly, the Geostar program, on this record, conforms to that definition. Section 1253 further provides that a transfer of a franchise will be taxed pursuant to that provision "if the transferor retains any significant power, right, or continuing interest with respect to the subject matter of the franchise * * *." Sec. 1253(a). The term "significant power, right, or continuing interest" includes, among other things, "A right to disapprove any assignment of such interest * * *." Sec. 1253(b)(2)(A). In this case, under section 9 of the "Exclusive License Agreement," Olympic specifically retained the right to disapprove the assignment *505 in whole or in part of the rights granted by the agreement. [23] Accordingly Olympic retained sufficient rights so that its transfer of the distributorships to petitioners would be taxed under the provisions of section 1253. With respect to the taxpayers in this case, a finding that their distributorships fit within the terms of section 1253 means that they are allowed to deduct contingent payments (sec. 1253(d)(1) and other payments properly considered to be the "principal sum" -- or their investment in the franchise (sec. 1253(d)(2)). Under section 1253(d)(1), payments which "are contingent on the productivity, use, or disposition of the franchise" are deductible under section 162(a) during the taxable year when paid or incurred. The second category, section 1253(d)(2), deals with "noncontingent" or "other payments." The statute further *506 categorizes these noncontingent payments into three subcategories. Under section 1253(d)(2)(A), a single payment in discharge of such principal sum for a franchise license is deductible ratably over the shorter of ten years or the term of the license agreement. Where the franchise agreement calls for the payment of a series of approximately equal payments for a period of more than ten years or the entire term of the franchise license, the payments are deductible in the taxable year in which each payment is actually paid. Sec. 1253(d)(2)(B). Payments not fitting into the above two categories are to be treated in regulations "prescribed by the Secretary," under section 1253(d)(2)(C). In this case the taxpayers' deductions on their tax returns were based upon their assumption that the franchise fee -- or "principal sum" in the language of the statute -- was to take place in the form of a single, noncontingent payment for a license that would last for a period of twelve years. The single payment was claimed to be an amount of $ 200,000 consisting of each petitioner's down payment of $ 5,000, his full recourse note of $ 2,500 payable on March 1, 1981, and his $ 192,500 partial recourse *507 promissory note. The partial recourse promissory note has two components -- a provision that each petitioner is liable for $ 20,000 of the amount of his note, and a provision that the $ 172,500 balance is nonrecourse. Under section 1253(d)(2)(A) of the Code, a single payment in discharge of such "principal sum" for a franchise license that lasts longer than ten years is deductible ratably over a period of ten years. Under this provision each petitioner claimed a deduction of $ 20,000 for the first year, that is 1980, based upon his purported $ 200,000 investment in the Geostar racquetball racquet franchise. [24]
*508 The question then arises whether the "principal sum" here was properly calculated as being $ 200,000. We think it was not. We have held that a transferee's tender of a nonrecourse promissory note can constitute payment as that term is used in section 1253(d)(2). Jackson v. Commissioner,86 T.C. 492, 518-521 (1986). In Jackson, however, we further noted that notes given in payment of the "principal sum" for the payment of a franchise license would not be considered as part of the principal sum if the notes lacked economic substance or were too contingent or speculative. The treatment for tax purposes of obligations that lack economic substance, or are too contingent, in a franchisee situation was discussed further in Driggs v. Commissioner,87 T.C. 759 (1986). In Driggs we held that notes that were too contingent for purposes of likely repayment would not be considered for purposes of establishing the franchisees' amortization deductions provided by section 1253. We rejected the notion that a contingent note may be disregarded only when the taxpayer relies upon the note for purposes of a deduction. We held instead that a contingent *509 note is invalid for any Federal tax purposes, either as part of a formula to compute a deductible amount or as the deductible amount itself. 87 T.C. at 775-776. Accordingly, in Driggs, we held that a contingent note, or one that lacked "economic substance," is not part of the "principal sum" for purposes of calculating the amortization under section 1253. In determining whether a nonrecourse note lacks economic substance or is too contingent to be treated as valid debt for Federal tax purposes, the courts have used various approaches. One line of cases looks at the fair market value of the property in relation to the stated purchase price or the principal amount of the indebtedness. This line of cases treats a nonrecourse obligation as a valid debt only if the acquired property reasonably secures payment of the obligation. Where the nonrecourse obligation is not adequately secured, a purchaser would acquire no equity in the property and therefore would have no economic incentive to repay the note. Estate of Franklin v. Commissioner,544 F.2d 1045 (9th Cir. 1976), affg. 64 T.C. 752 (1975). See also Waddell v. Commissioner,86 T.C. 848 (1986), *510 affd. 841 F.2d 264 (9th Cir. 1988); Odend'hal v. Commissioner,80 T.C. 588, 604-605 (1983), affd. 748 F.2d 908 (4th Cir. 1984); Hager v. Commissioner,76 T.C. 759, 773-774 (1981); Narver v. Commissioner,75 T.C. 53, 98-100 (1980), affd. per curiam 670 F.2d 855 (9th Cir. 1982); Beck v. Commissioner,74 T.C. 1534, 1552 (1980), affd. 678 F.2d 818 (9th Cir. 1982). The other major approach holds that an obligation, even if recourse, will not be treated as a true debt where payment, according to its terms, is too contingent. See Denver & Rio Grande Western R.R. Co. v. United States,505 F.2d 1266 (Ct. Cl. 1974) (obligation payable at rate of 32 percent of carload freight traffic revenue after movement of 100,000 net tons per year); Lemery v. Commissioner,52 T.C. 367 (1969), affd. per curiam on another issue 451 F.2d 173 (9th Cir. 1971) (obligation contingent upon business sold showing net profit); Columbus & Greenville Railway Co. v. Commissioner,42 T.C. 834 (1964), affd. per curiam 358 F.2d 294 (5th Cir. 1966), *511 cert. denied 385 U.S. 827 (1966) (obligation to pay based on mileage of railroad lines); Albany Car Wheel Co. v. Commissioner,40 T.C. 831 (1963), affd. per curiam 333 F.2d 653 (2d Cir. 1964) (obligation for severance pay -- incurred as part of acquisition of assets of predecessor corporation -- contingent upon failure to give employees notice prior to closing plant). This "contingent obligation" approach has been applied recently in tax shelter cases involving nonrecourse loans where the principal was payable out of exploitation proceeds.[25] The contingent liability theory is in many ways complementary to Estate of Franklin's reasonable security approach. Fox v. Commissioner, supra,80 T.C. at 1020. As we said in Waddell, supra,86 T.C. at 902, both theories represent efforts by the courts to validate from objective criteria the assumption upon which a valid nonrecourse debt (for tax purposes) is predicated -- the assumption that the obligation will be paid. A nonrecourse debt will be recognized for tax purposes only if it appears likely from all the facts and circumstances that the obligation will *512 be paid. Each petitioner's "partial recourse promissory note" must be tested under these principles. [26] If *513 we cannot conclude at the outset of the transaction that payment of the note is likely, then the note is too contingent or speculative to be recognized for tax purposes. Here, it is extremely unlikely that the Geostar franchises would have yielded sufficient revenues over the course of the distributorship term to pay off the $ 192,500 partial recourse promissory notes. In our view, the Geostar racquetball racquets never had the potential for yielding even the amount of income that would repay petitioners for their cash invested in the program. Initially, we note that only two years before the inception of the program, in 1978, Rovinsky acquired rights not only to the patent application for the tri-radial stringing process but also for the Geostar trademark, for a total consideration of $ 10,000. Thereafter, *514 Rovinsky twice tried to engage in licensing agreements whereby others would sell his Geostar racquet distributorships. In neither the Rovinsky-Gatliff agreement of 1978, however, nor in the Rovinsky-Cardell agreement of 1980, were the parties with whom Rovinsky contracted able to sell the distributorships successfully. It strains credibility to think that, within two years of Rovinsky's acquisition of these rights for $ 10,000, the utilization of these same rights by petitioners within population areas of no more than $ 325,000 would be worth some $ 200,000 apiece. Yet that was the representation made to each petitioner with respect to his Geostar racquetball racquet franchise. Moreover, even when petitioners invested in the Olympic program, there were no plans for the type of mass media advertising that would be required to move the Geostar racquet into the forefront of racquetball racquets. Even with such advertising, it is highly doubtful that the Geostar racquet would have been accepted by the general public. The racquet was apparently never test marketed. The Geostar racquet was an aluminum racquet being produced at a time when the trend was toward fiberglass and graphite *515 or composition racquets. Petitioners' own expert, who first tried the racquet the day before the trial, testified that the racquet was suitable only for use by beginners and women players. The marketing survey included with the Geostar promotional materials, however, anomalously predicts that up to ten percent of the "heavy" users of racquetball racquets would use the Geostar racquet. Respondent's more experienced and better qualified expert testified at some length about the defects of the Geostar racquetball racquet. We accept the testimony of respondent's expert and disregard the unsubstantiated predictions of the promotional materials. Nor was the tri-radial stringing pattern unique as petitioners assumed it to have been. We have noted that shortly after petitioners' investment, by mid-1981, or perhaps earlier, there was introduced an Omega "Galaxy" racquet which utilized a stringing pattern very similar to that of the Geostar racquet. Thus, petitioners' unissued patent rights to utilize the tri-radial stringing pattern for the Geostar racquet apparently had very little value because of any "unique" feature. Moreover, that tri-radial stringing pattern contributed to the defective *516 racquet problem. It is therefore not surprising that Rovinsky was, by the time of the trial, no longer pursuing a patent for the Geostar stringing process. The rights to utilize this patent were, however, the only substantive rights conveyed to petitioners by virtue of their distributorship agreement with Olympic and Geostar. Rovinsky's own lack of action on the patent indicates that these rights were worth no more than negligible amounts. Finally, it appears that the tri-radial stringing pattern produced a racquet that was beset with problems. The racquets broke frequently, including the racquet provided to petitioner Liberty. On the record we are satisfied that these defects were attributable at least in part to the design as well as to the manufacture of the racquets. In any event, it is clear to us that the Geostar racquetball racquet with the tri-radial stringing pattern was not a reliable product. Moreover, by 1980, the year of petitioners' investment, the racquetball industry was beginning to decline. Instead of welcoming soaring numbers of new players, the owners of racquetball courts were looking around for buyers for their facilities. In sum, even if the Geostar *517 racquetball racquet had been a better designed and manufactured product, we do not think that it would have justified an investment for a territorial distributorship in excess of $ 7,500 -- that is the cash and short-term note given by each petitioner. As things worked out, the distributorships were worth practically nothing. Our conclusion that the partial recourse promissory notes would not be paid is further buttressed by our observation concerning the structure of the Geostar program. At trial Rovinsky testified that the notes to Olympic were routinely forgiven at the investor's behest. The investor apparently only had to ask to be released from his obligations. Such a release then would be forthcoming upon the investor's surrender of his distributorship rights. [27] Indeed, the financing arrangement itself is somewhat ambiguous as to whether payment of the $ 20,000 "personal liability" portion of the note is even required. The note provides that the taxpayer agrees to become "personally liable," but the note also provides that it is to be secured by a security agreement. The security agreement recites that the security interest "is granted to the Secured party to secure *518 payment of those certain recourse and nonrecourse notes made by the Licensee * * *." The security agreement further contains explicit language stating that nothing contained therein will bind the licensee to do more than forfeit his interest in the distributorship. It provides "on default hereunder no deficiency or other personal judgment shall be rendered or entered against the Licensee." Thus, both Rovinsky's routine practice of forgiving the notes and the ambiguous language of the distributorship financing agreements indicate that there is no real prospect that the notes will be either enforced or enforceable. [28]
*519 Additionally, in view of the way the Geostar/Olympic program was administered, it is likely that petitioners would have valid legal defenses against collection of the notes. Zane, although testifying that he thought he was personally liable for $ 20,000 on the partial recourse promissory note, indicated that he thought that he might not have to pay that note because of the failure of Geostar to live up to its commitments. In this regard we note that not only has Geostar failed to make racquets available to petitioners, but also it has abandoned its efforts to patent the tri-radial stringing process in its current line of products. Instead of providing racquetball or tennis racquets that would utilize the patents that had been licensed to petitioners, Geostar instead then ceased making "tri-radial" tennis racquets or racquetball racquets altogether. Indeed, in 1982, shortly after it had given a free tennis racquet franchise to Zane, Geostar abandoned any tennis racquet manufacturing (or subcontracting out) whatsoever. It instead arranged to buy only racquetball racquets from the Richcraft Company. Those Richcraft racquetball racquets, however, were in no way unique; instead *520 they were merely copies of racquets provided to other sellers, with the Geostar name and different "cosmetics" added to them. Moreover, it is nowhere established that petitioners, as licensees of the right to use the Geostar tri-radial stringing method, in fact, had any rights to sell the new Richcraft racquets. [29] Geostar's cavalier attitude toward petitioners was further mirrored in its failure to provide any racquets either upon oral or written request, notwithstanding the fact that each petitioner had given $ 7,500 in cash to Olympic with the representation that they would pay to Olympic 15 percent of gross receipts upon sale of Geostar's products. Under these circumstances we doubt that payment of even the "personal liability" portion of the partial recourse promissory notes could or ever would be enforced. [30]
*521 Moreover, it appears that Olympic, the creditor of the long-term promissory notes, has, as a practical matter, basically gone out of existence. See n.12, supra. It apparently disappeared as a separate entity somewhere around the time that Geostar stopped obtaining the tri-radial racquets from Ta Chin in Taiwan in 1982 and abandoned its efforts to secure the patent that it had licensed to petitioners. We doubt that, after 1982, Geostar and Olympic were ever really treated as separate entities. We note that they shared the same office in Scottsdale, Arizona, that they shared the same bookkeeper, that is Elliot Rovinsky's father, Al Rovinsky, and that in 1982 Elliot Rovinsky signing himself as president of Geostar corresponded with petitioners on Olympic letterhead. We further note that at trial Rovinsky testified as to the willingness to forgive the Olympic notes. He, in fact, brought the Olympic records to trial in response to a subpoena. He apparently ignored with impunity the license agreement he had with Olympic when he gave Frank Cardell a 90-day contract to sell racquet distributorships. Moreover, at an early board meeting of Olympic, Rovinsky, although neither a shareholder *522 nor an officer of Olympic, was nevertheless bestowed with power to bind that corporation as he saw fit. The ostensible president of Olympic, Frank Joy, apparently rarely came to the office, and in 1982 Joy moved to Kansas where he died a year or so later. Under these circumstances, it appears to us that Olympic was merely a vehicle established for purposes of selling the Geostar program in 1980 and 1981. In all events, there is no indication that before ceasing activity, Olympic assigned its interest in the notes to Geostar or anyone else for purposes of their subsequent collection. On the basis of the foregoing factors, we conclude that the $ 192,500 partial recourse promissory note was too contingent or too unlikely to be repaid to constitute true indebtedness for Federal tax purposes. As such, it may not be considered part of the purchase price or "principal sum" for purposes of section 1253 or other tax benefits. Driggs v. Commissioner, supra,87 T.C. at 776. Accordingly, the principal sum that each petitioner may amortize under section 1253 is the $ 7,500 price actually paid by each petitioner in the form of the $ 5,000 cash down payment and the $ 2,500 *523 short-term recourse note. [31] Under section 1253(d)(2)(A), a single payment is ratably deductible over the shorter of ten years or the term of the license agreement. Here the term of the license agreement was 12 years. Accordingly, we hold that petitioners are entitled to deduct the $ 7,500 ratably over a ten-year period. Therefore, for the year before us, 1980, petitioners are entitled to a deduction of $ 750 apiece arising from their investment in the Geostar racquetball racquet distributorships. *524 Our determination that only the $ 7,500 in cash and short-term recourse note paid by petitioners constitutes valid debt also resolves the question of the amount for which the taxpayers were "at risk" within the meaning of section 465. As in effect during the taxable year at issue, section 465 provided in pertinent part: (a) Limitation to Amount at Risk. -- (1) In General. -- In the case of -- (A) an individual, * * * engaged in an activity to which this section applies, any loss from such activity for the taxable year shall be allowed only to the extent of the aggregate amount with respect to which the taxpayer is at risk (within the meaning of subsection (b)) for such activity at the close of the taxable year. * * * (b) Amounts Considered at Risk. -- (1) In General. -- For purposes of this section, a taxpayer shall be considered at risk for an activity with respect to amounts including -- (A) the amount of money and the adjusted basis of other property contributed by the taxpayer to the activity, and (B) amounts borrowed with respect to such activity (as determined under paragraph (2)). (2) Borrowed Amounts. -- For purposes of this section, *525 a taxpayer shall be considered at risk with respect to amounts borrowed for use in an activity to the extent that he -- (A) is personally liable for the repayment of such amounts, or (B) has pledged property, other than property used in such activity, as security for such borrowed amount (to the extent of the net fair market value of the taxpayer's interest in such property). No property shall be taken into account as security if such property is directly or indirectly financed by indebtedness which is secured by property described in paragraph (1).
Petitioners' Geostar racquetball racquet distributorships are subject to these at-risk rules. Sec. 465(c). Under these rules, petitioners' losses [32] from their Geostar franchises are limited to their amounts at risk in the activities. Sections 465(b)(3)(A) and (b)(4) provide as follows: (3) Certain Borrowed Amounts Excluded. -- For purposes of paragraph (1)(B), amounts borrowed shall not be considered to be at risk with respect to an activity if such amounts are borrowed from any person who -- (A) has an interest (other than an interest as a creditor) in such activity, or * * * (4) Exception. -- Notwithstanding *526 any other provision of this section, a taxpayer shall not be considered at risk with respect to amounts protected against loss through nonrecourse financing, guarantees, stop loss agreements, or other similar arrangements. We have determined that each petitioner's partial recourse promissory note is too lacking in economic substance and too contingent to be treated as a bona fide debt for Federal tax purposes, and accordingly, petitioners are not at risk as to that portion of the purchase price. Moreover, that portion of the $ 192,500 note that is payable only out of racquet sales or foreclosure upon the distributorship would expressly fail under the at-risk limitations of section 465(b)(4). In *527 other words, the nonrecourse feature of the partial recourse promissory note constitutes an amount protected against loss through "nonrecourse financing, guarantees, stop loss agreements, or other similar arrangements" within the meaning of section 465(b)(4). See also Porreca v. Commissioner,86 T.C. 821 (1986) and Capek v. Commissioner,86 T.C. 14 (1986). [33] The stop-loss or other similar arrangements, and the legislative history of this limitation are discussed in depth in those cases and need not be repeated here. Our finding that petitioners paid $ 5,000 in cash and were required to pay another $ 2,500 pursuant to a short-term recourse note means that they were at risk for all of the $ 7,500 allowable "principal sum" at the time they invested.
*528 We are aware that borrowed amounts, even if recourse, are not considered "at risk" with respect to an activity if the lender, or an entity "related" to the lender, has an interest in the activity other than as a creditor. Sec. 465(b)(3)(A). Here, Geostar might be said to have an interest in the distributorships other than as a lender because it has an interest in the sales of its racquets by the distributorships. See sec. 465(b)(3) and General Explanation of the Tax Reform Act of 1976 (Jt. Comm. on Taxation), 1976-3 C.B. (Vol. 2) 1, 51. If Geostar had such an interest and was a "related person" to Olympic when the taxpayers invested in 1980, it is possible that even the $ 2,500 short-term recourse note would not be considered "at risk" and hence would not be allowable as a deduction. This presents a very close factual issue in this case. The record indicates that Olympic was a vehicle set up for the sole purpose of selling the Geostar distributorships to investors, that Olympic sold such distributorships only in 1980 and 1981, and that Olympic more or less vanished from the scene in 1982. Rovinsky, the sole shareholder of Geostar, seems to be the person more or *529 less in power behind the scenes, and much remains to be explained about Geostar's actual relationship to Olympic. On this record, however, it does not appear that, at least in 1980, Geostar and Olympic had any common stockholders, nor were there other facts in the record that would make Geostar a "related person" of Olympic under section 465(b)(3)(C). Accordingly, we conclude that under the "at risk" rules, the $ 2,500 short-term recourse note may be counted as part of the "principal sum" and amortized and deducted ratably over the ten-year period. Our determination that each petitioner may deduct $ 7,500 as an amortized franchise fee has rendered unnecessary further consideration of the petitioners' alternative contention that, if the Geostar franchises are found to be lacking in substance, petitioners should then be allowed a loss deduction under section 165 for the $ 7,500 invested. A loss is deductible, moreover, only in the taxable year in which the loss is "evidenced by closed and completed transactions and as fixed by identifiable events occurring in such taxable year." Sec. 1.165-(1)(d)(1), Income Tax Regs. Here, the record does not support the contention that any losses *530 under section 165 that petitioners might have incurred as a result of their Geostar distributorships were incurred in 1980. To the contrary, the evidence shows that the Geostar activities and petitioners' involvement in them continued well past 1980. Accordingly, petitioners have not established that they were entitled to any loss deduction for 1980. To reflect the foregoing, Decision will be entered under Rule 155.
Footnotes
1. Petitioners Richard and Barbara Zane conceded respondent's adjustments made in the statutory notice of deficiency regarding the receipt of dividend income. ↩
2. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable year in question, and all "Rule" references are to the Tax Court Rules of Practice and Procedure. ↩
3. Petitioners did not offer an expert witness as to the value of the distributorships. Their sole expert was a John Paul Vaccaro, a racquetball professional. Vaccaro indicated that the Geostar 357 racquet, which he first saw and played with the day before the trial, had a larger "sweet spot" than other racquets. He stated, however, that he would recommend the racquet to novices and women players; that better men players tend to use the graphite racquets; and that the Geostar racquet was aluminum. Vaccaro was 19 years old at the time of trial, and was considered a semi-pro in the racquetball field. Respondent's expert witness, John P. Berkenkotter, prepared a report which indicates that, under even highly optimistic projections, Zane would have cleared at best only $ 19,645 annually, after subtracting from gross receipts his cost of goods sold and expenses of selling. The report further estimates that Liberty would have cleared at best only $ 19,505 annually net of cost of goods sold and selling expenses. The report concludes that neither petitioner would have been able to pay off the $ 20,000 annual licensing fee to Olympic and that, therefore, their investments were losing propositions. That expert report, however, fails to discuss the facts upon which its premises are based. For example, the report estimates the racquetball-playing population of Zane's territory at 9.48 percent of the total population (19,720 potential players compared to total population of territory of 208,011). The racquetball-playing population of Liberty's territory, however, is assumed to be only 7.79 percent of the total (23,321 potential players compared to total population of territory of 299,401). No explanation of this difference in percentages is set forth. Moreover, we note that both percentage figures appear to exceed substantially the national average. Berkenkotter has supplied figures showing that in 1980 the number of racquetball players in the United States was 7.03 million, or some 3.25 percent of the asserted 216.2 million population. The same materials indicate that in 1980 in the northeastern United States, there were 1.78 million racquetball players out of a total population of 48.4 million, or some 3.65 percent. There is no explanation why the figures for petitioners' territories involve two to three times as many racquetball players than is true of the nation as a whole. Moreover, the expert report assumes cost of goods sold and selling expenses in Zane's territory at approximately $ 21.00 per racquet. (Projected receipts of $ 37,440 less projected profit of $ 19,645 leaves costs and expenses of $ 17,795 which, when divided by projected sales of 832 racquets, indicates $ 21.39 costs and expenses). The same costs and expenses, however, are set at approximately $ 29.00 in Liberty's territory. (Projected receipts of $ 53,820 less projected profit of $ 19,503 on sales of 1,196 racquets, leaves costs and expenses of $ 28.69 per racquet). Again we are not told why this difference exists and can only guess at the reasons for the disparity. ↩
4. Both the promoter, Rovinsky, and Nicholson, the distributorship salesman, were vague about the times when Rovinsky revealed his marketing strategies. Liberty himself testified as to "marketing plans" in the prospectus when, in fact, there were none. We are nevertheless convinced that Rovinsky in 1980 had plans to conduct, through Geostar, a marketing campaign consisting of magazine advertising, manufacturer's representatives, "co-op" advertising using the distributor's names, and hiring a "name" professional to endorse his product. His activities in 1981 indicate that he had such plans in 1980. Moreover, we cannot believe that Ravinsky would have failed to mention such plans to Nicholson or that Nicholson would have failed to mention those plans to his clients, including petitioners, as an inducement to them to invest. On brief, respondent makes much of the fact that Olympic, the seller of the distributorships, disclaimed any right or obligation to engage in such marketing plans. We note, however, that this bar did not extend to Geostar, the actual supplier of the racquets. Geostar did, in fact, enter into such marketing strategies. Also both petitioners regarded Olympic and Geostar as interchangeable, and the record as a whole furnishes much support for their view. ↩
5. Petitioners paid those notes. Although the short-term notes called for the payment of interest at 8-1/2 percent, no interest was paid by petitioners nor was such interest demanded by Olympic. The checks were payable to "HG&H Geostar." The initials "HG&H" referred to the law firm, Himelrick, Gildar & Hilpert, which wrote the tax opinion in the prospectus and represented Olympic, Geostar, and Rovinsky. That firm received the checks paid for Geostar distributorships and retained 20 percent of the proceeds for its services. ↩
6. Each petitioner purchased an additional distributorship at the end of 1981. Zane bought a distributorship in Connecticut and Liberty acquired a distributorship in New York. ↩
7. Petitioner Zane was not listed among the Geostar distributors. Petitioner Liberty was listed as a Geostar distributor in New York. It may be that Zane was not included because he did not make payment for the advertising program until January of 1982. We note that petitioner Liberty paid for the advertising program in November of 1981. Additionally, subsequent correspondence between Zane and Rovinsky indicates that there may have been some difficulties surrounding the negotiation of Zane's first check issued in payment for the advertising. ↩
8. In 1980 Liberty originally was assigned the same racquetball territory that went to Zane (N.J. 102-R), and in 1981 he purchased another racquetball racquet distributorship in New York (N.Y. 116-R). To cure this duplication of N.J. 102, Liberty accepted the tennis racquet distributorship for that territory. He later exchanged N.J. 102-T for a combined tennis and racquetball distributorship in New York (N.Y. 125). At trial Rovinsky indicated that although he had licensed only the racquetball racquet rights to Olympic, he was authorized to extend tennis racquet rights to investors, apparently because of his ownership to the rights to the stringing process. ↩
9. Nicholson testified that he had mentioned Payson's proposed advertising program to his clients, but he was not specific in indicating whether Zane and Liberty were among those clients with whom he discussed Payson's proposed program. We note that Payson's television program would not have reached petitioner Liberty's territory which was located in and around Rochester, New York. We also note that Payson is Nicholson's brother-in-law and that Payson's own tax return is under audit in regard to his Geostar distributorships. Because of his obvious self-interest and the impracticality of his expecting Rovinsky to supply so many racquets on a consignment basis, the Court accords little weight to his proposed direct mail response campaign or to the projected profits therefrom. ↩
10. At trial, Rovinsky testified that petitioners were still active distributors for Geostar. This testimony probably astonished petitioners Zane and Liberty as much as it did the Court, particularly since their license was for an undivided interest in a nonexistent patent for a product no longer being produced. Rovinsky could not understand why petitioners had had trouble in obtaining racquets. According to Rovinsky, the reason the tri-radial pattern was dropped was because restringers -- that is, those persons who had to repair racquets whose strings had broken -- were having difficulties in restringing the tri-radial pattern. And according to Rovinsky there were, in fact, difficulties with defective racquets, but such difficulties were confined to one shipment of between 3,000 to 5,000 racquets supplied by the Taiwanese manufacturer. The Court is satisfied, however, that the tri-radial stringing pattern itself had a lot to do with the defective racquets, that the problems were more pervasive than Rovinsky would acknowledge, and that Rovinsky simply abandoned petitioners and other investors in these distributorships. ↩
11. In 1981 another competing racquet, the Omega "Galaxy 21," had a triangular stringing pattern which was similar to the Geostar tri-radial pattern. It was, however, priced higher than the Geostar racquet. ↩
12. The findings in this paragraph are based on Rovinsky's uncontroverted testimony. Quite inconsistently, however, Rovinsky testified on cross examination that in 1990 Olympic intended to hold its debtors to payment of the $ 20,000 portion of the partial recourse promissory notes. The Court rejects this inconsistent and wholly unbelievable testimony. Moreover, the record does not establish that Olympic is still in existence, and, if it is, that Rovinsky is authorized to speak for that corporation. ↩
13. Section 183, in relevant part, provides: SEC. 183 ACTIVITIES NOT ENGAGED IN FOR PROFIT. (a) General Rule. -- In the case of an activity engaged in by an individual or an electing small business corporation (as defined in section 1371(b)), if such activity is not engaged in for profit, no deduction attributable to such activity shall be allowed under this chapter except as provided in this section. (b) Deductions Allowable. -- In the case of an activity not engaged in for profit to which subsection (a) applies, there shall be allowed -- (1) the deductions which would be allowable under this chapter for the taxable year without regard to whether or not such activity is engaged in for profit, and (2) a deduction equal to the amount of the deductions which would be allowable under this chapter for the taxable year only if such activity were engaged in for profit, but only to the extent that the gross income derived from such activity for the taxable year exceeds the deductions allowable by reason of paragraph (1). (c) Activity Not Engaged in for Profit Defined. -- For purposes of this section, the term "activity not engaged in for profit" means any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212. ↩
14. See also Jenkins v. Commissioner,T.C. Memo. 1988-292↩. 15. These factors include: (1) the manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or his advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) whether elements of personal pleasure or recreation are involved. No single factor is decisive; rather, we must consider all the facts and circumstances with respect to the activity. Sec. 1.183-2(b), Income Tax Regs.↩
16. On brief, respondent contends that undertakings by Olympic and/or Geostar to promote and market the racquet were inconsistent with representations made in the license agreement. The sales documents were between petitioners and Olympic, not Geostar. We note that one portion of the application documents states "Notwithstanding anything herein to the contrary, certain affiliates and/or control persons of Olympic may engage in promotional activities concerning the name 'Geostar" which may indirectly benefit the applicant." Our review of the license agreement, moreover, indicates to us that its language was merely protective boilerplate to insulate the promoter from complaints of nonperformance by displeased investors. We do not believe that these disclaimers were meant to inform investors that Olympic and/or Geostar was not planning to promote the racquets. To the contrary, our review of the testimony convinces us that Rovinsky not only planned to engage in the marketing techniques that were performed, but also that he made a point of advising Nicholson and other salesmen of the pendency of these marketing initiatives. ↩
17. In this regard, it appears that each petitioner evaluated the program in terms of having to pay off only the $ 7,500 cash and $ 20,000 "personal" liabilities each incurred in investing in the program. Neither appears to have been particularly concerned about paying off the $ 172,500 nonrecourse balance of the purchase price. Each was fully aware that he would not be liable for this latter amount that would only be payable as a 15 percent charge against gross receipts or by a foreclosure after 10 years against his territorial distributorship. ↩
18. Although we have noted that another racquet, the Omega Galaxy, featured a similar triangular stringing pattern, it is not clear from the record that the Omega Galaxy racquet was available during 1980, the year at issue here. The Omega Galaxy clearly was available no later than mid-1981. ↩
19. Nicholson's documents projected a profit of $ 24,375 or $ 18.75 per racquet. This figure was derived after deducting $ 6.75 of the $ 45 cost of the racquet to reflect that 15 percent of gross proceeds was earmarked by the agreements for payment of the partial recourse promissory note. These credits were to be applied first to that portion of the note as to which petitioners were "personally" liable. Thus $ 25.50 per racquet ($ 18.75 + $ 6.75) sold could be credited against petitioners' perceived investment prorated over 10 years at $ 2,750 per year. The sale of 108 racquets would thus have yielded $ 2,754 per year. ↩
20. Petitioners' program would theoretically allow the $ 200,000 fee to be amortized and deducted over a period of ten years at $ 20,000 per year. Nevertheless, both Geostar's and Nicholson's promotional documents indicated the total deductions would be $ 27,500. Although the reasoning for this limitation is not explicit, it appears to be a recognition of the limits set by the "at risk" provisions of section 465. See the "at risk" discussion, infra.↩
21. We believe that our discussion of the section 183 criteria in large measure disposes of respondent's "economic substance" arguments. Indeed in our recent case of Rose v. Commissioner,88 T.C. 386 (1987), on appeal (6th Cir., December 14, 1987), we indicated that a finding of a profit objective under the section 183 criteria also constitutes a finding that there was at least subjectively some "business purpose" to the transaction. 88 T.C. at 411. We realize that Rose also discusses "objective" economic substance, but that is a mere restatement and refinement of existing case law. We note, however, that our disposition of this case on the basis of the contingent nature of the notes, infra, is wholly consistent with Rose's objective economic substance test, especially as that test revolves around considerations of "Relationship Between Sales Price and Fair Market Value," 88 T.C. at 417, and "Structure of the Financing," 88 T.C. at 419↩. 22. Section 1253, in relevant part, provides: SEC. 1253. TRANSFERS OF FRANCHISES, TRADEMARKS, AND TRADE NAMES. (a) General Rule. -- A transfer of a franchise, trademark, or trade name shall not be treated as a sale or exchange of a capital asset if the transferor retains any significant power, right, or continuing interest with respect to the subject matter of the franchise, trademark, or trade name. (b) Definitions. -- For purposes of this section -- (1) Franchise. -- The term "franchise" includes an agreement which gives one of the parties to the agreement the right to distribute, sell, or provide goods, services, or facilities, within a specified area. (2) Significant Power, Right, or Continuing Interest. -- The term "significant power, right, or continuing interest" includes, but is not limited to, the following rights with respect to the interest transferred: (A) A right to disapprove any assignment of such interest, or any part thereof. (B) A right to terminate at will. (C) A right to prescribe the standards of quality of products used or sold, or of services furnished, and of the equipment and facilities used to promote such products or services. (D) A right to require that the transferee sell or advertise only products or services of the transferor. (E) A right to require that the transferee purchase substantially all of his supplies and equipment from the transferor. (F) A right to payments contingent on the productivity, use, or disposition of the subject matter of the interest transferred, if such payments constitute a substantial element under the transfer agreement. (3) Transfer. -- The term "transfer" includes the renewal of a franchise, trademark, or trade name. * * * (d) Treatment of Payments by Transferee. -- (1) Contingent Payments. -- Amounts paid or incurred during the taxable year on account of a transfer, sale, or other disposition of a franchise, trademark, or trade name which are contingent on the productivity, use, or disposition of the franchise, trademark, or trade name transferred shall be allowed as a deduction under section 162(a) (relating to trade or business expenses). (2) Other Payments. -- If a transfer of a franchise, trademark, or trade name is not (by reason of the application of subsection (a)) treated as a sale or exchange of a capital asset, any payment not described in paragraph (1) which is made in discharge of a principal sum agreed upon in the transfer agreement shall be allowed as a deduction -- (A) in the case of a single payment made in discharge of such principal sum, ratably over the taxable years in the period beginning with the taxable year in which the payment is made and ending with the ninth succeeding taxable year or ending with the last taxable year beginning in the period of the transfer agreement, whichever period is shorter; (B) in the case of a payment which is one of a series of approximately equal payments made in discharge of such principal sum, which are payable over -- (i) the period of the transfer agreement, or (ii) a period of more than 10 taxable years, whether ending before or after the end of the period of the transfer agreement, in the taxable year in which the payment is made; and (C) in the case of any other payment, in the taxable year or years specified in regulations prescribed by the Secretary, consistently with the preceding provisions of this paragraph. ↩
23. Also another such "significant power, right, or continuing interest" is the "right to prescribe the standards of quality of products used or sold * * *." Sec. 1253(b)(2)(C). Here the right to manufacture the product (the racquetball racquet) was reserved to Olympic/Geostar under the terms of section 1 of the Exclusive License Agreement. ↩
24. Although the record is not entirely clear on the point, we think that petitioners had moved beyond the "start-up" phase of their activity and could hold themselves out as being in the trade or business of selling racquets before the end of 1980. They apparently had sample racquets supplied by Nicholson, and they had executed their agreements with Olympic/Geostar. The ensuing problems in obtaining the product prevented the petitioners from maintaining their business, but not from holding themselves our as ready to do business in the first instance. See Herrick v. Commissioner,85 T.C. 237, 266 (1985); cf. Driggs v. Commissioner,87 T.C. 759, 764↩ n.5 (1986). 25. See, e.g., CRC Corp. v. Commissioner,693 F.2d 281 (3d Cir. 1982), affg. in relevant part, revg. and remanding on other grounds Brountas v. Commissioner,73 T.C. 491 (1979) (payment of note contingent upon discovery off recoverable amounts of oil or gas); Brountas v. Commissioner,692 F.2d 152 (1st Cir. 1982), vacating and remanding on other grounds 73 T.C. 491 (1979) (same); Gibson Products Co. v. United States,637 F.2d 1041 (5th Cir. 1981) (same); Estate of Baron v. Commissioner, supra,83 T.C. at 550-553 (note payable solely out of proceeds of record sales); Fox v. Commissioner, supra,80 T.C. at 1022-1023 (note payable solely out of book sale proceeds); Saviano v. Commissioner,80 T.C. 955 (1983), affd. 765 F.2d 643 (7th Cir. 1985) (note payable solely out of sales proceeds of mined gold); Graf v. Commissioner,80 T.C. 944↩ (1983) (note payable solely out of profits from foreign dredging operation). 26. We think that each petitioner's $ 2,500 "recourse" note was sufficiently enforceable by its terms (and was in fact paid within three months of each petitioner's investment) to be included as payment of the principal sum. See Jackson v. Commissioner,86 T.C. 492, 521 (1986), and Rose v. Commissioner, supra,88 T.C. at 423 and n.21, supra.↩
27. This procedure seems to be an abridgement of paragraph 4(c) of the license agreement. Pursuant to that paragraph a defaulting investor will have the value of his distributorship applied to the outstanding balance of his note. The value is to be determined by an appraiser acceptable both to the investor and to Olympic. As a practical matter, it appears that Rovinsky agreed to dispense with any independent appraiser and to forgive any default upon the notes in exchange for the distributor's surrender of his rights under the distributorship agreement. To us the conclusion is inescapable that once Olympic and/or Geostar had obtained the cash down payment and payment of the short-term notes, subsequent payments by the distributor were largely irrelevant to Rovinsky. We further note that any payment on the note is, pursuant to the terms of the partial recourse promissory note, to be applied first to that $ 20,000 portion of the note with respect to which the investor is ostensibly "personally liable." Thus it would seem the investor is to be released from any personal liability on the note so long as the value of his distributorship is deemed to be at least one-tenth of its originally stated $ 200,000 value. ↩
28. Rovinsky testified that Olympic intended to hold petitioners to their $ 20,000 "personal" liabilities on the partial recourse promissory note. In view of his past performance, however, we give this testimony little weight. See also n.12, supra.↩
29. Rovinsky testified that petitioners were still distributors of Geostar racquets, yet in a letter to Rovinsky in 1982, Zane sought samples of "your new racquets * * *," but he never received any. See n.10, supra.↩
30. For similar reasons, we do not find convincing petitioners' argument that petitioners' agreement is enforceable against them under New Jersey law. Not only has Rovinsky declined attempts at enforcement in the past, he has also acted in a way which would seem to guarantee an effective defense to any contract action. We realize that, in the boilerplate of its agreements, Olympic and/or Geostar insulated themselves from almost any duties to petitioners. We nevertheless believe that, through oral representations, Olympic/Geostar undertook to provide a marketable product and effective marketing support. Its failure to achieve and maintain these undertakings, particularly the failure to provide any product to sell, precluded any chance petitioners had to make a profit. That failure has also precluded, in our view, any possibility that Olympic might hold petitioners to their agreement to pay over an additional $ 20,000 in the year 1990 (extended to 1992 at the time of the grant of the "free" tennis racquet franchises). ↩
31. We have earlier held that an enforceable note can constitute payment as that term is used in section 1253. Jackson v. Commissioner,86 T.C. 492↩ (1986). We think that the short-term note in this case was sufficiently likely to be paid as to constitute "payment" for purposes of this case. We note that it was issued in recourse form, that it was payable within approximately two or three months after petitioners made their initial down payment, and that they in fact paid it without any demand having been made by Geostar or Olympic. We are aware that at trial Rovinsky testified that he had been willing to forgive even the "recourse" notes which apparently would include defaulted payments of the short-term notes. That factor alone, however, does not convince us these short-term notes were too contingent to be considered part of the "principal sum" under section 1253. Unlike the partial recourse promissory notes, these short-term notes were relatively small in amount, and they were due before any failures in performance by Olympic and/or Geostar would have justified the assertion by petitioners of defenses to their collection. Moreover, these short-term notes were straightforward in their terms; they did not contain the ambiguous language of the security agreement indicating that they may in fact have been nonrecourse obligations. This, however, is a close issue since the security agreement itself specifically referred to "the recourse note being due on the first day of March, 1981." Despite the ambiguities created by the security agreement, we conclude that the short-term "recourse" notes were, in fact as well as in form, recourse. 32. Section 465(d) defines loss as follows: (d) Definition of Loss.↩ -- For purposes of this section, the term "loss" means the excess of the deductions allowable under this chapter for the taxable year (determined without regard to the first sentence of subsection (a)) and allocable to an activity to which this section applies over the income received or accrued by the taxpayer during the taxable year from such activity (determined without regard to subsection (e)(1)(A)).
33. Petitioners appear to have conceded, at least implicitly, much of the "at risk" issue. Each testified that he was not expected to repay $ 172,500 of the partial recourse promissory note. That expectation is, in fact, consistent with the terms of the note. Moreover, as noted earlier, the promotional materials appear to contemplate that Geostar investors will not be "at risk" for $ 172,500 of the asserted $ 200,000 obligation. See n.20, supra.↩